UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 632 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| ABRAHAM BROWN, *et al.*, | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 887 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| ANTONIO WILLIAMS, *et al.*, | ) | |

## MEMORANDUM OPINION AND ORDER

Since 2006, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") has engaged in sting operations wherein undercover agents present individuals in this District with an opportunity to rob a fictitious drug stash house. *See generally United States v. Mayfield*, 771 F.3d 417, 419-24 (7th Cir. 2014); *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011). These two long-pending consolidated criminal cases, which are part of what is commonly referred to as the "false stash house cases," have served to undermine legitimate law enforcement efforts in this country. It is undisputed that between 2006 and 2013, the defendants charged in this District in the ATF false stash house cases were 78.7 black, 9.6 percent Hispanic, and 11.7 percent white. During this same period, the District's adult population was approximately 18 percent black, 11 percent Hispanic, and 63 percent white.[1] These numbers generate great disrespect for law enforcement efforts. Disrespect for the law simply cannot be tolerated during these difficult times. It is time for these false stash house cases to end and be relegated to the

---

[1] These statistics were calculated from 2010 census data for the 18 counties that make up this District.

1

dark corridors of our past. To put it simply, our criminal justice system should not tolerate false stash house cases in 2018.

No one feels stronger than this Court about the problems this District has continuously had with firearm violence. During this Court's three decades of public service, it has consistently pointed out and stressed the deadly toll firearms have taken in Chicago and throughout the country. In fact, during this Court's 11 years of service on the United States Sentencing Commission, it strongly advocated for and accomplished the strengthening of penalties for firearm trafficking.

This Court understands that dedicated federal agents, who often place themselves in life-risking situations, sincerely believed that they would recover deadly firearms from the violent streets of our District in these stash house sting operations. However, to paraphrase Supreme Court Justice Louis Brandeis, to declare that in the administration of the criminal law "the end justifies the means" is to declare that the government may violate fundamental principles of common fairness to secure the conviction of an alleged criminal. *See Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). That is not where our criminal law should be in 2018.[2] Our society simply cannot accept a "win at all costs" mentality in the delicate world of criminal law enforcement, which is ultimately dependent on proactive citizen involvement.

Our nation's current tragic pattern of weapons violence does not justify the problematic consequences presented by the government's use of false stash house cases as an investigative technique. The answer to our nation's current tragic pattern of weapons violence lies in stricter firearms regulations, especially with respect to automatic, multi-round weapons, and traditional law enforcement investigative techniques. The Court is mindful that this city just passed the 89th

---

[2] Counsel for the government represented during oral arguments in this case that, thankfully, the government is no longer charging individuals in false stash house cases in this District. (*See* Evid. Hr'g Tr. at 527-28.)

2

anniversary of the infamous St. Valentine's Day massacre, which killed seven Chicagoans with automatic weapon fire. Yet, even during the low points of the great violence caused by the alcohol wars of Prohibition, the ATF did not seek to use "false alcohol warehouse" tactics against any ethnic organized crime groups to promote public safety. Instead, the ATF used solid investigative work to garner the great public respect of the Elliot Ness era that still lives today as the gold standard of law enforcement. This type of work inspires great public cooperation with law enforcement, unlike the false drug stash house cases before the Court.

The problems with the false stash house cases start at the beginning and do not get any better at the end. The typical false stash house case commences with the recruitment of a confidential informant (or "CI"). Most of the time these are individuals with criminal justice problems. In today's world, they tend to be black or Hispanic—two groups that unfortunately dominate both our federal and local American criminal justice systems. These principally minority confidential informants are told by federal agents to tell their friends and associates that there are places with a large quantity of drugs that can be robbed. The hope is that the informants will organize robbery crews that will result in significant arrests of violent criminals and seizure of weapons. Sometimes these cases work out in that fashion. However, all too often, the government's lucrative trap attracts potential defendants with minor criminal records who might otherwise have never attempted a fictitious crime of this nature. It is no surprise that many of these potential defendants with minor criminal records are also minorities, like their so-called confidential informant friends and associates. At the end, many of these defendants face sentencing guideline ranges that have been significantly inflated by the government's false drug house scenarios. *See United States v. Washington*, 869 F.3d 193, 222-23 (3d Cir. 2017), *cert denied.*, 2018 WL 311803 (Jan. 8, 2018) (remanding for potential post-judgment discovery to

3

challenge a 264-month sentence in fictitious cocaine robbery scenario that triggered a very real 20-year mandatory minimum sentence). The *Washington* case in particular is representative of a broad point of view held by judges who are held in high esteem by this Court. For example, Judge Theodore McKee, the former Chief Judge of the U.S. Court of Appeals for the Third Circuit, has pointedly noted that "the potential for abuse and mischief that is endemic to fictitious stash-house stings should not be ignored." *Id.* at 223 (collecting cases). Judge McKee specifically noted that "[a]s is all too often the case, not only do stash-house stings risk ensnaring those who might otherwise not have committed crimes, but also the resulting convictions regularly give rise to particularly dubious applications of the Sentencing Guidelines and mandatory minimum sentences." *Id.* at 226.

The inherent problems of this District's false stash house cases must be seen through the lens of our country's sad history of racism. Every time our country's law enforcement system can be perceived as contributing to that sad history, our justice system suffers and needlessly alienates minority communities who no longer wish to come forward as witnesses or victims. This Court spent more than ten years working as a member of the United States Sentencing Commission before it could reduce the needless disparity between the penalties for crack and powder cocaine, which were correctly revised because they were perceived as discriminatory toward black defendants. This country cannot afford such self-inflicted wounds in light of its sad history of racism. Viewed in this context, the false stash house cases are no different than the extraordinary powder/crack sentencing disparities that previously existed.

In these two cases, Defendants move to dismiss the indictments filed against them on grounds of racial profiling, arguing that ATF wrongfully targeted black and Hispanic individuals

for participation in the stings.[3] (*United States v. Brown* ("*Brown*"), No. 12 CR 632, R. 518; *United States v. Williams* ("*Williams*"), No. 12 CR 887, R. 338.) These cases are deeply troubling and are emblematic of problems that have plagued our criminal justice system for decades. As this Court recognized nearly two decades ago, "[r]acial profiling of any kind is anathema to our criminal justice system because it eviscerates the core integrity that is necessary to operate that system effectively in our diverse democracy." *Martinez v. Vill. of Mt. Prospect*, 92 F. Supp. 2d 780, 782 (N.D. Ill. 2000). These words carry as much force today as they did nearly two decades ago. These sting operations have used tremendous public resources to investigate and prosecute a large number of principally minority individuals for fictitious crimes. "In this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them[.]" *United States v. Black*, 750 F.3d 1053, 1057 (9th Cir. 2014). Over and over again, these "tawdry" stings have been "directed at unsophisticated, and perhaps desperate defendants . . . who easily take the all-too-tempting bait put out for them by the government." *United States v. Conley*, 875 F.3d 391, 402-03 (7th Cir. 2017) (citations and internal quotation marks omitted),.

Like our colleague in the U.S. Court of Appeals for the Sixth Circuit, this Court finds "the concept of these stash house sting operations at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law." *United States v. Flowers*, No. 15-3988, 2017 WL 4785960, at *15 (6th Cir. Oct. 24, 2017) (Stranch, J., concurring). It is unclear to the Court why, with all the tactics available to them,

---

[3] The defendants in *Brown* are Abraham Brown, Kenneth Taylor, Alfred Washington, Christopher Davis, and Dwaine Jones. The defendants in *Williams* are Antonio Williams, John Hummons, and Howard Lee. The defense of these cases has been handled in a coordinated fashion, and nearly identical sets of motions to dismiss and other documents have been filed in the two cases. The Court refers to the cases collectively throughout this opinion.

federal law enforcement agents would adopt a narrative tinged with racial overtones to conduct sting operations involving serious federal charges. Even if law enforcement agents stay on the right side of the line, this is dangerous territory. It hardly needs to be stated that agents of the federal government should not be injecting the issue of race into their criminal investigations in any way, shape, or form.

Fortunately for the government, the question before this Court is not whether the practices used in these sting operations are honorable or fair. Instead, the sole question presented to the Court in these cases is whether law enforcement agents violated the Due Process Clause of the Fifth Amendment in pursuing these investigations. At first blush, the evidence submitted by Defendants—including the sheer number of non-white individuals prosecuted as a result of the sting operations—presents troublesome indicia of discrimination. But this Court is not permitted to simply accept matters at first blush. The Court must dig deeper to test the reliability and weight of the evidence that has been submitted. In doing so, the Court concludes that Defendants have failed to meet the heavy burden that currently must be satisfied to obtain dismissal of a federal criminal indictment. Therefore, the motions to dismiss must be reluctantly denied.

## BACKGROUND

"According to the standard ATF script for the [stash house] sting, a fictional drug courier was disgruntled with his organization and wanted to rob one of its stash houses. [The target of the investigation] was to meet with the courier to discuss logistics, then recruit a crew, gather weapons, and help the courier carry out the robbery." *Mayfield*, 771 F.3d at 421. As a result of the sting operations, a host of defendants in this District and elsewhere have been convicted of "conspiring to distribute cocaine that didn't actually exist—cocaine they planned to liberate from a fictional stash house guarded by members of an imaginary Mexican cartel." *Lewis*, 641 F.3d at

777. "Though it might seem odd, the fact that the stash house, the drugs—and indeed the whole plot—was fake is irrelevant," because "[t]he crime of conspiracy is the agreement itself[.]" *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009).

These sting operations have withstood a number of challenges in the courts, including in the U.S. Court of Appeals for the Seventh Circuit. *See, e.g., Conley*, 875 F.3d at 400-01 (upholding conviction arising from fictitious stash house sting even though the evidence against the defendant was "meager," where evidence showed that the defendant had attended one meeting where co-conspirators outlined their plan to rob the stash house, including the need to bring firearms); *Flowers*, 2017 WL 4785960, at *3 (rejecting defendant's argument that ATF agents engaged in outrageous conduct by "luring the impoverished . . . defendants" into committing a fictitious stash house robbery); *United States v. Dunlap*, 593 F. App'x 619, 621 (9th Cir. 2014) (holding that ATF agents' actions in conducting stash house sting operation did not "violate fundamental fairness or shock the universal sense of justice" so as to warrant dismissal of the indictment); *United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014) ("Where the government does nothing more than make a stash house robbery available, there is no inducement under the law of entrapment.").

But at the same time, the stings have "drawn criticism in news reporting, scholarly writing, and from the judiciary." *Flowers*, 2017 WL 4785960, at *14 (Stranch, J., concurring); *see also Conley*, 875 F.3d at 402 (noting the "substantial body of criticism of . . . stash house cases both from this circuit and others"). ATF protocols provide that the stings, referred to within the agency as "home invasion investigations," are intended to "concentrate on identifying persons and infiltrating groups that collectively and/or as a community focus their criminal

activities on executing robberies, by means of force, for personal gain."[4] (*Brown*, R. 511-2, ATF Order at 3.) Agents conducting the stings are directed to "target persons who show a propensity of doing harm to the public through violent behavior/armed robberies and whose activities have been documented either through criminal history, criminal reputation, or self-incrimination." (*Id.*) But critics have noted that the ATF does not always "target existing criminal enterprises or have prior suspicion of potential targets," and instead the stings often "ensnare low-level crooks who jump at the bait of a criminal windfall." *Flowers*, 2017 WL 4785960, at *14 (citation omitted). As is the case here, many of those caught in the snare are individuals living in low-income minority communities.

## I.    The *Brown* investigation

The events underlying the *Brown* case began in April 2012, when Chicago ATF agents began a firearms investigation in Chicago's Englewood neighborhood. (*Brown*, R. 555-1, Report of Investig. at 144.)[5] According to the complaint, between April and August 2012, a confidential informant working with the ATF purchased more than 20 firearms from Dwaine Jones in a series of controlled buys. (*Id.*, R. 1, Compl. ¶ 5; *id.*, R. 555-1, Report of Investig. at 144.) Jones was known to associate with the Gangster Disciples, a "violent street gang" in Chicago. *United States v. Ellis*, 622 F.3d 784, 788 (7th Cir. 2010); *see also United States v. Smith*, 223 F.3d 554, 560-61 (7th Cir. 2000) (describing the history of the Gangster Disciples street gang, which "operated a

---

[4] The "stash house sting" operation was the brainchild of ATF Agent Richard Zayas, who has "made a career of coordinating the stings, having worked on or been involved with over 100 similar scenarios across the country." *Flowers*, 2017 WL 4785960, at *1. For decades, Agent Zayas led trainings for ATF agents on how to conduct the stings, and some of his training materials have been submitted as an exhibit to the motion to dismiss. (*See Brown*, R. 511-3, Zayas Training Materials.)

[5] The Court notes that the page numbers listed for record cites throughout this opinion refer to the page numbers assigned at the time the document was electronically filed with the Clerk of Court, not to the internal page numbers contained within the documents.

massive drug distribution business in the Chicago area"). He had no prior felony convictions but had arrests for assault, aggravated battery, and theft. (*Brown*, R. 511-5, Takedown Mem. at 95.)

In July 2012, the confidential informant reported to ATF agents that, during an unrecorded conversation, Jones raised the possibility of committing an armed robbery and asked the informant whether he knew about any good targets. (*Id.*, R. 1, Compl. ¶ 5.) During a controlled buy with Jones in Englewood the following day in which he sold the informant another firearm, the informant, working at the instruction of ATF agents, told Jones about a fictitious stash house that could be robbed. (*Id.* ¶ 6; *Id.*, R. 555-1, Tr. at 153-54.) Jones responded that he knew some men who could commit the robbery. (*Id.*; R. 1, Compl. ¶ 6.) During another controlled buy a few days later, Jones told the informant that he had "told a couple o' my guys" about the stash house and that they were interested in committing the robbery. (*Id.*, R. 555-1, Tr. at 164.)

Later that same month, the informant introduced Jones to the undercover agent, Dave Gomez, who was posing as a disgruntled courier for a drug cartel. (*Id.*, R. 1, Compl. ¶ 8.) During a recorded conversation, Agent Gomez told Jones that he was looking for a "professional crew" to rob twenty kilograms or more of cocaine from a stash house that was guarded by three men with guns. (*Id.*, R. 1, Compl. ¶ 8; *id.*, R. 555-1, Tr. at 184, 186, 190.) Jones said that he had not personally committed an armed robbery, but that, in his words, the people that "I hang with, they done this shit before." (*Id.*, R. 555-1, Tr. at 184.) Jones told Agent Gomez he would bring him three or four men. (*Id.* at 192-93.) Jones also mentioned during this meeting that the police were looking for him and his "guys" because they had recently committed a shooting and had accidentally shot and severely injured an innocent bystander. (*Id.* at 177-78.)

The next day, Jones brought Abraham Brown and Kenneth Taylor to meet with Agent Gomez. (*Id.*, R. 1, Compl. ¶ 10; Gov't's Ex. 4E,[6] Tr. at 21-66.) ATF records show that both Brown and Taylor were affiliated with the Gangster Disciples street gang. (*Id.*, R. 555-1, Records at 228.) Brown's criminal history included convictions for attempted armed robbery, residential burglary, and aggravated unlawful restraint. (*Id.*, R. 1, Compl. ¶ 12 n.4; *id.*, R. 511-5, Takedown Mem. at 96.) Taylor's criminal history included convictions for a drug offense and for possessing a firearm after a felony conviction. (*Id.*, R. 1., Compl. ¶ 12 n.5.) After Jones introduced Brown and Taylor to Agent Gomez, Jones left the meeting. (Gov't's Ex. 4E, Tr. at 22.) Agent Gomez then explained the robbery scenario, and asked Brown and Taylor if they had committed a robbery before. (*Id.* at 23-26.) Taylor replied, "That's what I do," and explained that he did not rob people on the street, but always committed robberies in houses. (*Id.* at 29.) Brown explained that the first time he went to prison was for an armed robbery, stating, "[T]hat['s] what I do," and later stated, "I'm a burglar too." (*Id.* at 26-27, 57.) Brown also stated that he had previously robbed a drug dealer of "a brick," or kilogram, of cocaine. (*Id.* at 53.) Taylor stated that he had previously committed a home invasion robbery and had stolen drugs, guns, and money. (*Id.*) Taylor also stated that he had committed robberies in Chicago with a group of "my other guys," and had gotten "half o' bricks." (*Id.* at 53.) Brown stated that, if necessary, they would "eliminate" everyone inside the stash house. (*Id.* at 29.)

On August 1, 2012, Brown, Taylor, and Jones met Agent Gomez again, this time with another crew member Brown had recruited, later identified as Alfred Washington. (*Id.*, R. 1, Compl. ¶ 15.) Law enforcement records show that Washington was also affiliated with the Gangster Disciples street gang, and that he had a prior drug conviction. (*Id.*, R. 555-1, Records at

---

[6] It appears that this document (a transcript of one of the recorded conversations) was inadvertently not uploaded at the time the government filed its voluminous exhibits. The Court refers to it by the document number assigned by the government.

230; *id.*, R. 1, Compl. ¶ 15 n.6.) During the meeting, Brown informed Agent Gomez that he and the other men were "all family," and that to support themselves they "do the crime shit." (*Id.*, R. 555-1, Tr. at 354-55.) Brown stated that he regularly robbed "cribs and shit," but that he had not done a "lick"— or armed robbery—since the prior year, because in his words, "I only try to do big scores." (*Id.* at 259.) Brown and Washington also discussed home invasion robberies they had committed together. (*Id.* at 260.) Brown stated that committing robberies was "how we eat." (*Id.* at 261.) Later in the conversation, Brown and Washington discussed a home invasion robbery they had recently committed with Brown's cousin, later identified as Christopher Davis, who they said was skilled at bypassing home alarm systems. (*Id.* at 279-80.) The men then discussed further details of the stash house robbery, including a plan by Brown to pose as police officers to confuse the cartel members. (*Id.* at 281-87.) Brown stated that if things got "ugly" the cartel members would be "permanently sleepin'." (*Id.* at 288.) Brown stated that he already had a buyer lined up to purchase "at least" 10-15 kilograms of the cocaine they expected to obtain from the robbery. (*Id.* at 248.)

On August 14, 2012, Brown, Taylor, Washington, and Jones met Agent Gomez at a prearranged location so that they could commit the robbery. (*Id.*, R. 1, Compl. ¶¶ 24, 26.) Brown brought a fifth crew member, Davis, who was Brown's cousin. (*Id.* ¶ 26; *id.*, R. 555-1, Tr. at 397-98.) Law enforcement records show that Davis was also known to affiliate with the Gangster Disciples and had convictions for burglary, residential burglary, and drug possession. (*Id.*, R. 1, Compl. ¶ 26 n.7.) During the meeting, Brown stated, "We got a hell of a crew," adding, "I don't know if I can even put this same crew together again, so I'm hopin' that it do go down today." (*Id.*, R. 555-1, Tr. at 381.) Brown, Taylor, and Washington told Agent Gomez that they had brought a total of three guns, "two handguns . . . and one big one," which were stored in Jones's

van. (*Id.*, R. 555-1, Tr. at 417.) Shortly thereafter, agents arrived and arrested the men. (*Id.*, R. 1, Compl. ¶ 28.) Inside Jones's van, agents found two loaded 9-millimeter handguns, a sawed-off shotgun, masks, and zip ties. (*Id.* ¶ 29.)

As a result of these events, Brown, Taylor, Washington, Jones, and Davis were charged with conspiracy, attempt to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a), and possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c).[7] (*Id.*, R. 45, Indictment.) Jones has since pled guilty to two counts of the indictment in exchange for a plea agreement. (*Id.*, R. 115, Min. Entry; *id.*, R. 116, Plea Agreement.) The charges against the other *Brown* Defendants remain pending.

## II.    The *Williams* Investigation

The events underlying the *Williams* case began in the fall of 2012, when ATF agents from around the country came to Chicago as part of a law enforcement "surge" targeting Chicago neighborhoods that were experiencing a rash of violent crime. (*Williams*, R. 354-1, Gov't's Disc. Resps. at 43-44, 52; *Brown*, R. 511-5, Takedown Mem. at 111, 130.) The *Williams* investigation focused on an area near East 63rd Street and South Martin Luther King Drive on Chicago's south side.[8] (*Id.*, R. 354-1, Gov't's Disc. Resps. at 43-44 & n.1.) In November 2012, a confidential informant working with the ATF brought agents information about a man he knew as "Tweet." (*Id.*, R. 1, Compl. ¶ 8; *id.*, R. 354-1, Report of Investig. at 462.) According to the informant, "Tweet" had spoken to the informant earlier in the day (during an unrecorded conversation) and had discussed armed robberies he had recently committed, and had expressed

---

[7] Defendants were initially charged with certain drug offenses in addition to the charges outlined above, but as to all Defendants other than Jones, the drug charges were later voluntarily dismissed by the government. (*Brown*, R. 288, Gov't's Mot. to Dismiss; *id.*, R. 294, Order.)

[8] Two other stash houses cases pending in this District, *United States v. Payne*, 12 CR 854 (N.D. Ill. filed Nov. 5, 2012), and *United States v. Cousins*, 12 CR 865 (N.D. Ill. filed Nov. 6, 2012), also arose from the fall 2012 law enforcement surge. (*See* R. 354-1, Gov't's Disc. Resps. at 43 n.1.)

an interest in conducting more robberies. (*Id.*, R. 1, Compl. ¶ 8; *id.*, R. 354-1, Report of Investig. at 462.) Working at the direction of ATF, the informant told "Tweet" that he had an associate with information about a potential robbery of narcotics. (*Id.*, R. 354-1, Report of Investig. at 462.) ATF agents used law enforcement databases to identify "Tweet" as Antonio Williams. (*Id.*) Law enforcement records showed that Williams was known to affiliate with the Gangster Disciples and had five felony convictions, including convictions for aggravated assault with a deadly weapon and unlawful use of a weapon following a felony conviction, as well as an arrest for drug trafficking. (*Id.*; *id.*, R. 332-5, Takedown Mem. at 126.)

On November 7, 2012, ATF Agent Carl Valles, posing as a disgruntled drug courier, met with Williams at 63rd and King Drive. (*Id.*, R. 354-1, Tr. at 464-71.) At the beginning of the conversation, Agent Valles asked Williams, "you ready to do this lick?" Williams replied, "Hell yea[h]." (*Id.* at 465.) Agent Valles asked, "You gotta crew," and Williams responded, "Yea, they right there, right now," as they all lived in the immediate area. (*Id.* at 466.) After Agent Valles explained that the robbery would target a cartel stash house containing eight to ten kilograms of cocaine and guarded by two men with guns, Williams responded that he had "guns like a motherfucker," including "AK's" and "AR-15's" and that if necessary, he would "come to the door shoo[t]in'." (*Id.*) Williams said he had a group available to do the robbery, which included his uncle and others he knew from the area. (*Id.* at 466-68.) Williams described the robbery opportunity as "beautiful" and told Agent Valles that "it [was] an honor" to be involved. (*Id.* at 467.) At the end of the conversation, the two agreed to meet soon with other members of the robbery crew.[9] (*Id.* at 470.)

---

[9] On November 8, 2012, Agent Valles met with Williams and two individuals introduced to him by Williams to discuss details of the planned robbery, but these two individuals never showed up on the date of the takedown and are not defendants in this case. (*See Williams*, R. 354-1, Tr. at 522-61; *id.*, R. 1, Compl. ¶¶ 35-37.)

On November 12, 2012, Agent Valles met with Williams and his uncle, who agents later identified as John Hummons. (*Id.*, R. 1, Compl. ¶ 40; *id.*, R. 354-1, Tr. at 473-90.) During the meeting, the men discussed the details of how they would carry out the robbery, and Hummons told Agent Valles, "I like doin' this shit . . . we can just get rich." (*Id.*, R. 354-1, Tr. at 476-86.) A third man had driven Williams and Hummons to the meeting, and Hummons explained that this third man would act as the driver during the robbery. (*Id.* at 488-89; *id.*, R. 1, Compl. ¶ 40.) Agent Valles asked to speak to the driver, later identified as Howard Lee, but Williams and Hummons said that they would explain the details of the robbery to him so that there was no need for him to meet Agent Valles. (*Id.*, R. 354-1, Tr. at 488.)

On November 14, 2012, Lee drove Williams and Hummons to meet Agent Valles and a second undercover ATF agent so that the men could commit the robbery. (R. 1, Compl. ¶¶ 52-54; *id.*, R. 354-1, Tr. at 495-510.) The second undercover agent spoke to Lee and confirmed that he understood the details of the robbery. (*Id.*, R. 354-1, Tr. at 496-97.) Hummons, Lee, and Williams all confirmed that they were ready to commit the robbery, with Hummons adding, "If you guys wanna go now, I'll do it my motha' fuckin' self." (*Id.* at 496.) Shortly thereafter, agents arrived and arrested the men. (*Id.*, R. 1, Compl. ¶ 64; *id.*, R. 2, Min. Entry.) A search of Lee's car revealed a 9-millimeter semi-automatic handgun loaded with 16 rounds of ammunition. (*Id.*, R. 1, Compl. ¶ 65.)

Following their arrest, all three Defendants made statements implicating themselves in the planned robbery.[10] (*Id.* ¶¶ 67-69.) Lee gave a written statement in which he admitted that he and Williams had a mutual friend who made a living by committing robberies, including robbing drug dealers "for their drugs and money." (*Id.*, R. 354-1, Lee's Statement at 513.) Lee stated that had been the driver for the friend during previous robberies, and that the friend had recruited Lee to drive for Williams during the planned stash house robbery. (*Id.* at 514-17.) As a result of these events, Williams, Lee, and Hummons were charged with conspiracy, attempt to commit Hobbs Act robbery, and possession of a firearm in furtherance of a crime of violence.[11] (*Id.*, R. 24, Indictment; *id.*, R. 162, Order.)

### III.    Racial Profiling Defense

Defendants first raised the issue of racial profiling in a discovery motion filed more than four years ago. (*See Williams*, R. 50.) In July 2013, this Court granted Defendants discovery relevant to this potential defense over the government's objection. (*Id.*, R. 69, Order.) Over the course of the next two years, this Court ordered significant additional discovery from the government, including information pertaining to the confidential informants, as well as law enforcement strategies used in the stings. (*See, e.g., id.*, R. 140, Order; *id.*, R. 143, Order; *id.*, R. 164, Order; *id.*, R. 191, Min. Entry; *id.*, R. 232, Min. Entry.) The government estimates that as a

---

[10] Defendants moved to suppress inculpatory statements they made while being transported to the ATF office in a police vehicle, which had been bugged with an audio device. *See United States v. Williams*, 15 F. Supp. 3d 821, 825, 831-33 (N.D. Ill. 2014), *abrogated by United States v. Paxton*, 848 F.3d 803 (7th Cir. 2017). Hummons also moved to suppress a statement he later made at the ATF office under a "fruit of the poisonous tree" analysis. *Id.* The Court granted the motion to suppress the secretly recorded statements, but denied the motion with respect to Hummons' statement at the ATF office. *Id.* at 831-33. The matter has not been revisited in light of the pending motions to dismiss, but the Seventh Circuit has since abrogated this Court's reasoning in suppressing the secretly recorded statements. *See Paxton*, 848 F.3d at 809-13.

[11] Lee has indicated his intent to plead guilty, and a change-of-plea hearing has been tentatively scheduled for March 2018. (R. 416, Min. Entry.) Lee has not formally joined in the motion to dismiss, although the Court has deferred holding his plea hearing until the motion is resolved.

result of the Court's orders, more than 5,000 pages of materials have been disclosed. (*Id.*, R. 364, Gov't's Resp. to Mot. for Renewed Disc. at 2.)

In 2014, the Court also granted Defendants' motion for the appointment of an expert, Professor Jeffrey Fagan, to conduct a statistical analysis of the stash house cases in this District to determine whether there were statistically significant racial anomalies. (*See Brown*, R. 269, Order.) To assist Professor Fagan in obtaining the data necessary to conduct his analysis, the Court presided over protracted third-party subpoena proceedings involving the Illinois State Police ("ISP"). (*See, e.g., Williams*, R. 186, Order; *id.*, R. 208, Order; *id.*, R. 214, Order; *id.*, R. 226, Order.) This process resulted in an extensive amount of crime data being turned over to Professor Fagan for use in his analysis. (*See Williams*, R. 338-2, Fagan's Report at 5-6.)

In May 2016, Professor Fagan completed his report, and he opines that the racial makeup of the stash house defendants in all cases prosecuted in this District shows a strong statistical anomaly when compared to a control group he constructed from the ISP data. (*See id.*) In September 2016, Defendants filed the present motion (as did the defendants in the other pending stash house cases), relying heavily on Professor Fagan's report to argue that the ATF targeted them because of their race in violation of the Fifth Amendment.[12] (*Id.*, R. 338.) In Defendants' view, Professor Fagan's report definitively establishes "(1) discriminatory effect, in that there

---

[12] The Court notes that Defendants do not assert any claim of "outrageous government conduct." *See United States v. Russell*, 411 U.S. 423, 431 (1973) (observing that the Court "may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"). Although the Supreme Court has not "closed the door entirely" on this defense, the Seventh Circuit has long declined to recognize it. *United States v. Smith*, 792 F.3d 760, 765-66 (7th Cir. 2015); *see also United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) ("Outrageous government conduct is not a defense in this circuit."); *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008) ("[T]his circuit clearly and consistently has refused to recognize any defense based on . . . outrageous government conduct." (internal quotation marks omitted)). In 2014, the defendants in *United States v. Alexander*, 11 CR 148, asserted the defense in a motion to dismiss, but the court denied the motion finding that the defense was not viable under the law of this Circuit. *Alexander*, R. 236. The Eighth and Ninth Circuits do recognize the defense, but both have concluded that the circumstances surrounding a standard ATF phony stash house sting do not amount to a due process violation. *See United States v. Combs*, 827 F.3d 790, 795 (8th Cir. 2016); *United States v. Dunlap*, 593 F. App'x 619, 620-22 (9th Cir. Dec. 4, 2014).

was a clear pattern of racial disparities in whom the ATF chose to target, and (2) discriminatory intent, in that those racial disparities are inexplicable on grounds other than race." (*Id.* at 7.) In a nutshell, Defendants believe that Professor Fagan's analysis leads to "the inescapable conclusion that the ATF selected the stash house defendants on the basis of race." (*Id.*) They argue that the charges should be dismissed on grounds of selective enforcement/racial profiling. (*Id.*)

In January 2017, the government's expert, Professor Max Schanzenbach, completed his rebuttal report. (*Id.*, R. 354-1, Schanzenbach's Report.) Professor Schanzenbach opines that there are numerous problems with Professor Fagan's analysis. (*Id.*) Among other issues, he concludes that Professor Fagan's comparison group is far too broad. (*Id.* at 5-8.) In his view, the 290,000 individuals identified by Professor Fagan from the ISP data were not similarly situated to the stash house defendants because there was no indication that these individuals were actually "available to the ATF as possible targets" or that they were "likely willing to participate in a stash house robbery." (*Id.* at 5-6.) He also opines that only the initial targets of the stash house stings should have been used in the comparative analysis, not the entire defendant population, because most of the defendants were recruited by the *targets* and not by the ATF; in Professor Schanzenbach's view, the inclusion of all 94 defendants in the comparative analysis fundamentally skewed Professor Fagan's results. (*Id.* at 18-21.) In February 2017, the government filed a response to Defendants' motion to dismiss, relying heavily on Professor Schanzenbach's report and arguing that Defendants have failed to prove that the indictments in these two cases were the product of racial profiling. (*Id.*, R. 354, Gov't's Resp.) In August 2017, Defendants filed a reply brief, accompanied by a reply report prepared by Professor Fagan

responding to some of Professor Schanzenbach's criticisms.[13] (*Id.*, R. 378, Reply; *id.*, R. 378-3, Fagan's Reply Report.) A two-day evidentiary hearing was held in December 2017 before the nine district judges presiding over the 12 pending stash house cases, at which both experts testified in detail regarding their opinions reached in these cases. (*Brown*, R. 654, Min. Entry; *id.*, R. 655, Min. Entry; *see also* Evid. Hr'g Tr. at 1-541.)

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). This includes motions alleging "a defect in instituting the prosecution" due to "selective or vindictive prosecution." FED. R. CRIM. P. 12(b)(3)(A)(iv). "Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (citation omitted); *see also United States v. Khan*, No. 15-CR-00286, 2017 WL 2362572, at *18 (N.D. Ill. May 31, 2017) ("[W]hile an indictment may be dismissed if subject to a defense that raises only a question of law, a defense relating to the strength of the government's evidence ordinarily must wait for trial." (citation omitted)). Therefore, in deciding such a motion, the Court must accept the allegations in the indictment as true. *Moore*, 563 F.3d at 586.

## ANALYSIS

"The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation and internal quotation marks omitted); *see also United States v. Russell*, 411 U.S. 423, 435 (1973) ("The execution of the federal laws under our Constitution is confided primarily to the Executive

---

[13] This Court previously granted Defendants leave to file an amended reply brief and a document correcting portions of the reply report prepared by Professor Fagan. (*Williams*, R. 403, Reply; *id.*, R. 407, Corr. to Fagan's Reply Report.) The Court has considered these corrected documents in reaching this opinion.

Branch of the Government[.]"). Thus, a "presumption of regularity" attaches to prosecutorial decisions, and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (citation omitted). In the usual case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (citation omitted).

Nevertheless, this discretion is "subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." *Russell*, 411 U.S. at 435. One such constraint, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that "a decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (citation and internal quotation marks omitted); *see also Washington v. Davis*, 426 U.S. 229, 239 (1976) (observing that the Fifth Amendment contains "an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups"). A claim of selective prosecution is governed by "ordinary equal protection standards." *Armstrong*, 517 U.S. at 465. To establish an equal protection violation in this context, the defendant must demonstrate that the administration of the criminal law was "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Id.* at 464-65 (citation and internal quotation marks omitted). The defendant must come forward with "clear evidence" showing that the decision to prosecute "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 465. This high standard stems from a desire

19

to avoid unnecessary interference in the functions of the Executive Branch. *Id.* "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.*

A claim of selective enforcement is generally governed by the same standards. *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002). A defendant asserting a claim of selective enforcement must establish that "a law or regulation was enforced against him, but not against similarly situated individuals of other races." *Barlow*, 310 F.3d at 1010. But "it is considerably harder" to prove a selective enforcement claim. *United States v. Hare*, 820 F.3d 93, 100 (4th Cir. 2016) (citation omitted). That is because "[i]n a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency." *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001). By contrast, a litigant alleging, for example, "that they were stopped [by police] due to racial profiling would not, barring some type of test operation, be able to provides the names of other similarly situated motorists who were not stopped." *Id.*; *see also Hare*, 820 F.3d at 100 (noting argument that in a selective enforcement claim, "there are less likely to be records of similarly situated individuals who were never investigated or arrested").

In an appeal of a discovery order in another stash house case, the Seventh Circuit explained another important distinction between selective prosecution and selective enforcement claims: Selective enforcement claims are directed at wrongful conduct by law enforcement agents, and unlike prosecutors, they "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc); *see also Chavez*, 251 F.3d at 640 ("[T]he constitutional implications of

interfering with the prosecutorial function [are] a factor at the heart of a criminal defendant's claim of selective prosecution, but [are] not directly at issue in a plaintiff's civil claim of racial profiling."). As the Seventh Circuit explained, if law enforcement agents offered stash house robbery opportunities "to black and Hispanic suspects, yet not to those similarly situated in criminal background and interests but of other ethnicity," then they engaged in unconstitutional race discrimination. *Davis*, 793 F.3d at 720. It would not matter that the United States Attorney's Office "prosecuted every case the agencies presented, or chose[] 25% of them in a race-blind lottery," because "the constitutional problem would have preceded the prosecutor's role and could not be eliminated by the fact that things didn't get worse at a later step." *Id.* Thus, if Defendants prove that law enforcement agents would not have pursued these investigations had they been white, dismissal of the charges is warranted. *Id.* at 722-23. "If not, there would not be a basis to attribute this prosecution to the defendants' race," and the case must proceed to a resolution of the charges. *Id.*

## I.     Applicable Standard of Proof

The first issue the Court must resolve is what standard of proof Defendants must satisfy to obtain dismissal of the indictment. The government argues that the "clear and convincing evidence" standard adopted by the U.S. Supreme Court in *Armstrong* is applicable, whereas Defendants believe that an ordinary preponderance of the evidence standard applies. (*See Williams*, R. 338, Defs.' Mot. at 18-19; *Brown*, R. 555, Gov't's Resp. at 15-16; *id.*, R. 630, Defs.' Reply at 8-10; *id.*, R. 643, Gov't's Surreply at 1-3.) Defendants do not cite any direct authority for the proposition that the preponderance standard applies when resolving a motion to dismiss a federal criminal indictment, but they believe that comments by the Seventh Circuit in *Davis* explaining the distinctions between selective enforcement claims and selective prosecution

claims means that the higher standard adopted in *Armstrong* is inapplicable. (*Williams*, R. 338, Defs.' Mot. at 18-19; *id.*, R. 378, Defs.' Reply at 7-10.)

It is true that this case does not directly implicate prosecutorial discretion, as Defendants' argument is that the ATF, rather than the U.S. Attorneys' Office, discriminated against them. *Armstrong* is thus not directly on point. But at the same time, the Court does not find it appropriate to adopt a mere "preponderance of the evidence" standard in deciding Defendants' motion. Applying such a low standard would be inconsistent with the substantial discretion afforded to the executive branch in enforcing the laws of this nation. *See Russell*, 411 U.S. at 435. The Supreme Court recognized this deference in a case where a criminal defendant argued that the death penalty was being implemented in a racially discriminatory manner in Georgia. *See McCleskey v. Kemp*, 481 U.S. 279, 297 (1987). The Supreme Court noted that the defendant was challenging a discretionary judgment "at the heart" of the criminal justice system, explaining as follows:

> One of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws . . . . Implementation of these laws necessarily requires discretionary judgments. *Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.*

*Id.* (emphasis added).

The same reasoning applies here. Defendants are challenging decisions "at the heart" of the criminal justice system: the decision of law enforcement agents to pursue an investigation pertaining to the violation of federal law. As Defendants themselves acknowledge, such decisions inherently involve discretionary judgments that take into account a variety of factors. (*See Williams*, R. 378, Defs.' Reply at 64.) Most of these factors, including enforcement priorities and how best to achieve them, are beyond the scope of judicial review. *See Armstrong*,

517 U.S. at 465; *Russell*, 411 U.S. at 435. Defendants are correct that the Seventh Circuit in

*Davis* noted the different standard that applies to resolving a motion for *discovery* in connection

with a claim of selective enforcement. *See* 793 F.3d at 720. But *Davis* did not directly address

what standard governs resolution of a *substantive* claim of selective enforcement. In another

recent stash house case, the Third Circuit expressly noted this distinction, and held that

substantive claims of selective enforcement continue to be governed by the "clear evidence"

standard. *Washington*, 869 F.3d at 214. The court explained:

> *Substantive* claims of selective prosecution and selective enforcement are
> generally evaluated under the same two-part test, which is derived from a line of
> seminal Supreme Court cases about the collision between equal protection
> principles and the criminal justice system. A defendant challenging a criminal
> prosecution at either the law enforcement or prosecution inflection points must
> provide "clear evidence" of discriminatory effect and discriminatory intent[.]

*Id.* (emphasis in original). The court discussed *Davis*, including the language Defendants point to

here, but concluded that *Davis* did not answer the question of what standard governs a

substantive claim of selective enforcement. *Id.* at 218 ("*Davis* does not explicitly discuss the

discriminatory purpose/intent prong of the traditional *Armstrong/Bass* analysis. *Davis* might

therefore be fairly described as an opinion entirely about discriminatory effect as a gateway to

discovery.").

This Court reads *Davis* the same way: it recognized a lower standard for granting

*discovery* on a selective enforcement claim, but it did not address the standard for resolving a

motion to dismiss on grounds of selective enforcement on the *merits*. In the absence of clear

direction from the Supreme Court or the Seventh Circuit that a lower evidentiary burden applies

to a substantive claim of selective enforcement in these unique and troublesome stash house

cases, this Court must reluctantly follow the Supreme Court's admonition in *McCleskey* and will

require clear evidence before concluding that federal law enforcement agents abused their

discretion in pursuing these investigations.[14] This Court emphasizes that this discussion may be different if the Court were writing this opinion from chambers on the 26th floor of the federal courthouse rather than the 25th floor, or from chambers on the shores of the Potomac River rather than Lake Michigan. This Court firmly believes that *McCleskey* was wrongly decided,[15] especially as it related to the use of the death penalty, yet this Court is obligated to follow the dictates of *McCleskey* until it is overruled by the Supreme Court.

## II. *Daubert*

Before turning to the merits, the Court must next address the threshold issues of the parties' expert reports, which are a key component of their respective positions in this case. The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703 and the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). The proponent of the expert's testimony bears the burden of demonstrating that it satisfies the

---

[14] Defendants seek to distinguish *McCleskey*, arguing that it was based solely on a desire to avoid interference with prosecutorial discretion. (*See Brown*, R. 630, Defs.' Reply at 48.) Unfortunately, *McCleskey* was broadly written and was not solely on prosecutorial discretion. Instead, the Supreme Court explained that raw statistical data would not properly account for the many discretionary judgments made in connection with a decision to impose the death penalty, including those made by each individual jury based on a variety of permissible factors. 481 U.S. at 294-95. The Supreme Court explained:

> [E]ach particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire. Each jury is unique in its composition, and the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense. Thus, the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case. In those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions.

*Id.* (internal citations omitted). The Court must read *McCleskey* to urge caution whenever the judiciary is examining a discretionary judgment "at the heart" of the criminal justice system, as the Court is here. *Id.* at 297.

[15] Notably, *McCleskey* was a 5-4 opinion, and Justice Lewis Powell, who authored the majority opinion, later publicly stated that he came to regret his decision and would change his vote if he could. *See* https://www.washingtonpost.com/archive/politics/1994/06/10/retired-justice-changes-stand-on-death-penalty/9ccde42b-9de5-46bc-a32a-613ae29d55f3/?utm_term=.41373c2298c0.

*Daubert* standard. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). Under *Daubert*, "the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 779 (citation and internal quotation marks omitted). On the question of reliability, courts consider a variety of factors, including: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Id.* (citation omitted). Other "benchmarks" for determining reliability include: "(5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) [w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) [w]hether the expert has adequately accounted for obvious alternative explanations; (9) [w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (10) [w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Id.* at 779-80 (citation and internal quotation marks omitted). This list is "neither exhaustive nor mandatory," however, and instead "the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors." *Id.* at 780 (citations and internal quotation marks omitted).

In the end, the inquiry is a flexible one that provides wide latitude for the Court to serve its role as "gatekeeper." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834-35 (7th Cir. 2015). "[T]he key

to the gate is not the ultimate correctness of the expert's conclusions," but rather "the soundness and care with which the expert arrived at her opinion." *Id.* at 834 (citation and internal quotation marks omitted). "[R]ejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, advisory committee notes (2000 Amendments). The Court's evaluation under *Daubert* is not intended to "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

When the Court rather than a jury is the factfinder on a particular issue, "the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence," but still "must determine admissibility at some point." *Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016); *see also Estate of Stuller v. United States*, 811 F.3d 890, 895 n.3 (7th Cir. 2016) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." (citation omitted)). Once the Court has "fulfilled its gatekeeping function" under *Daubert*, "it becomes a trier of fact that needs to assess the evidence itself—not just the methodology underlying that evidence." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015). In effect, the Court takes on the "essential role as the arbiter of the weight and credibility of expert testimony." *Id.* (citation omitted). Neither side has formally moved to exclude the other's expert, but for the sake of completeness the Court considers each factor in the *Daubert* analysis.

### A.    Professor Fagan's Report

#### 1.    Professor Fagan's qualifications as an expert

In assessing an expert's qualifications, the Court should consider the expert's full range of education, experience, and training. FED. R. EVID. 702; *LG Elec. USA v. Whirlpool*, 661 F. Supp. 2d 940, 951 (N.D. Ill. 2009). Professor Fagan is a professor of law at Columbia Law School, a professor of epidemiology at Columbia, and a senior research scholar at Yale Law School. (*Williams*, R. 338-2, Fagan's Report at 49.) Among his many other credentials, he was the Director of the Center for Community and Law at Columbia Law School from 2003-09 and again from 2011-15, and from 1996-2006 he was the founding director of the Center for Violence Research and Prevention at Columbia's Mailman School of Public Health. (*Id.* at 50.) Prior to his appointment at Columbia, he was a professor of criminal justice at Rutgers-The State University of New Jersey, and an associate professor at John Jay College of Criminal Justice at the City University of New York. (*Id.*) He has co-authored three books and published numerous articles on law and social policy in peer-reviewed journals, law reviews, and other scholarly publications on criminal justice, criminology, and other topics. (*Id.* at 51-61.) He has served on committees of the American Society of Criminology, the National Academy of Science, and the National Science Foundation. (*Id.* at 49.) He is also a fellow of the American Society of Criminology. (*Id.*) He has previously served as an expert witness in litigation alleging Fourth and Fourteenth Amendment civil rights violations resulting from racially selective police enforcement in the conduct of investigative stops by police in New York City, and from 2012-15 he advised the Boston Police Department in its review of its practices. (*Id.*) The Court finds Professor Fagan to be well qualified to provide empirical research and to opine on the discriminatory effect of ATF's practices in this case.

27

### 2. Reliability of Professor Fagan's methodology

Rule 702 requires that the expert explain the methodologies and principles that support his or her opinions; in other words, the expert cannot simply assert a "bottom line." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). To be reliable, the expert's opinion must be "reasoned and founded on data," and must also "utilize the methods of the relevant discipline." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). In effect, "[t]he goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (citation omitted)).

To reach his opinions in this case, Professor Fagan obtained criminal history records for each of the 94 stash house defendants and coded them for race, criminal history, and other factors. (*Williams*, R. 338-2, Fagan's Report at 5.) He then conducted a detailed statistical analysis of the stash house defendants with respect to race, criminal history, and other factors. (*Id.* at 15-20.) He also obtained extensive crime data from the ISP meeting certain parameters. (*Id.* at 6.) Once individuals were identified from these criteria, he constructed a complete criminal history for each individual using a search of ISP databases, which included variables such as race, gender, age, number of prison sentences, and other criminal history factors. (*Id.* at 7, 9.) He conducted a comparison of the stash house defendants and the pool of other individuals, who he calls "potential eligibles," with respect to race, criminal history, and other factors. (*Id.* at 21-23.) This included conducting a series of empirical tests for assessing Defendants' selective enforcement claims in this case: a disparate treatment test, a second test incorporating a principle known as augmented inverse probability weighting, and a third test using propensity score

matching.[16] (*Id.* at 23-30.) From these tests he reached certain results, which in his opinion demonstrate a pattern of discrimination by the ATF in the stash house stings. (*Id.* at 31-37.) For purposes of *Daubert*, the Court finds that Professor Fagan's methods were properly based on accepted statistical principles.

In the government's view, "The Fagan Report is flawed from top to bottom. It starts with the wrong comparison group, then performs elaborate statistical analyses based on core assumptions that are simply mistaken." (*Brown*, R. 555, Gov't's Resp. at 37.) The government argues that Professor Fagan's report "fail[ed] to . . . make the most elementary comparisons," and "has no value as causal explanation and is therefore inadmissible in a federal court." (*Id.* at 27 (citations omitted).) But the Court finds that these criticisms go more to the weight of Professor Fagan's opinions than to their admissibility. For purposes of *Daubert*, Professor Fagan's opinions are properly grounded in established statistical principles and his extensive knowledge of the field of criminology. Whether there are any weaknesses in his opinions and how much weight they should be given are matters for this Court to decide separately. *See Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360.

### 3. Whether Professor Fagan's report will assist the trier of fact

Next, the Court must decide whether Professor Fagan's testimony will assist the trier of fact in determining a relevant fact at issue in the case. The Court finds that this inquiry is

---

[16] Professor Fagan describes probability weighting as again using "a logistic regression equation. The distinction in this analysis is that the procedure first estimates one logistic regression model to predict the status—in this case, race—and then uses another logistic regression model to predict the outcomes given the results of the first model. . . . If a predictor is statistically significant, it is presumed to be not independent of the outcome, but instead a predictor of that outcome." (*Williams*, R. 338-2, Fagan's Report at 28.) He describes propensity score matching as follows: "For each person in the 'treatment' group—Black or non-White people—one or more persons is selected from the 'control' group—White people—that are matched to the first group on all characteristics except race. This simulates random assignment to a treatment group—*race*—by matching persons on numerous predictors of treatment assignment . . . . The average treatment effect (ATE) is computed by taking the average of the difference in probability of selection between the observed and potential outcomes (Stash House defendant v. potential eligible) for each subject." (*Id.* at 29.)

satisfied. Professor Fagan provides a statistical analysis of the stash house Defendants and a comparison to what he deems to be a "similarly situated" group of individuals. Making this comparison is a key component of Defendants' racial profiling claim, and this Court does not have the ability to gather its own extensive crime data or conduct detailed statistical analyses based on that data. Accordingly, the Court finds that Professor Fagan's report and testimony will assist the Court in resolving Defendants' racial profiling defense.

### B.    Professor Schanzenbach's Report

#### 1.    Professor Schanzenbach's qualifications as an expert

Professor Schanzenbach is a professor of law at Northwestern University School of Law. (*Brown*, R. 555-1, Schanzenbach's Report at 33.) He holds a law degree from Yale Law School and a Ph.D. in economics, also from Yale. (*Id.*) Among his many credentials, he previously served as the director of the Searle Center on Law, Regulation, and Economic Growth, and served as a board member on the American Law and Economics Association and other scholarly organizations. (*Id.* at 37-38.) He has published books and articles in peer-reviewed journals, law reviews, and other scholarly publications involving empirical studies of sentencing disparities and other topics. (*Id.* at 33-35.) The Court concludes that Professor Schanzenbach is qualified to offer opinions about the statistical analysis conducted by Professor Fagan.

#### 2.    Reliability of Professor Schanzenbach's methodology

To reach his opinions in this case, Professor Schanzenbach reviewed a variety of materials, including detailed information from all 24 sting operations, Professor Fagan's report, Defendants' motion to dismiss, and the thousands of pages of discovery materials turned over by the government in this case. (*Brown*, R. 555-1, Schanzenbach's Report at 2.) From there he conducted a detailed analysis of Professor Fagan's report, including testing various assumptions

on which Professor Fagan's report is based. (*Id.* at 3-4.) He also conducted his own binomial statistical analysis comparing the stash house defendants to the racial makeup of a smaller group that he believes is more similarly situated to the stash house defendants than the broad group of "potential eligibles" defined by Professor Fagan. (*Id.* at 8.) From there he offers various opinions about the validity of Professor Fagan's results, and offers his own opinion about whether there is statistically significant evidence of racial profiling by the ATF. (*Id.* at 8-9, 13-26.) For purposes of the *Daubert* inquiry, the Court finds that Professor Schanzenbach's analysis is reliably based on accepted scientific methods and his comprehensive review of the data relevant to this case.

### 3. Whether Professor Schanzenbach's report will assist the trier of fact

The Court also finds that Professor Schanzenbach's testimony will assist the trier of fact. Defendants' motion to dismiss relies heavily on the opinions offered by Professor Fagan. Testing the validity and strength of Professor Fagan's conclusions is a necessary component of resolving the motion to dismiss. Through his extensive knowledge of statistical principles, Professor Schanzenbach can provide the necessary adversarial testing of Professor Fagan's report. Therefore, the Court finds that the third prong for admissibility is satisfied. The Court will consider the weight and persuasiveness of both experts' reports in connection with its analysis of the merits below.

## III. Merits

### A. Discriminatory Effect

The first element of a selective enforcement claim is discriminatory effect. *Armstrong*, 517 U.S. at 464-65; *Barlow*, 310 F.3d at 1010. To establish discriminatory effect in this case, Defendants point to Professor Fagan's report, which in their view provides definitive proof that the ATF discriminated against black and Hispanic individuals in conducting the stash house

investigations. (*Williams*, R. 338, Defs.' Mot. at 18-28.) In *Chavez*, the Seventh Circuit expressly recognized that a litigant may rely on statistics to show discriminatory effect. 251 F.3d at 638 ("While few opinions directly acknowledge that statistics may be used to prove discriminatory effect, the [Supreme] Court has repeatedly relied on statistics to do just that."). The Seventh Circuit reaffirmed, however, that "[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Id.* That is because "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." *United States v. Bass*, 536 U.S. 862, 864 (2002) (emphasis omitted); *see also Barlow*, 310 F.3d at 1012 (rejecting selective enforcement defense because defense expert's statistical data failed to provide a basis for concluding that individuals who were not stopped by police were similarly situated to the defendant). Additionally, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted." *Chavez*, 251 F.3d at 638 (citation omitted). "In short, their usefulness depends on all of the surrounding facts and circumstances." *Id.*

The statistics compiled by Professor Fagan show that between 2006 and 2013, the defendants prosecuted in the ATF false stash house cases in this District were 78.7 percent black, 9.6 percent Hispanic, and 11.7 percent white. (*Williams*, R. 338-2, Fagan's Report at 15.) To create a comparison group, Professor Fagan gathered the names of individuals in an eight-county area (Cook, Lake, Will, DuPage, Kane, Kendall, LaSalle, and Winnebago) who had one or more state convictions for a broad set of offenses, including murder, rape, robbery, aggravated assault, arson, narcotics, and firearms offenses, between 2000 and 2013.[17] (*Id.* at 5-9; Evid. Hr'g Tr. at

---

[17] The Court did not grant Defendants access to information about every individual contained in the ISP data with only an arrest, given the massive scope of such a data set, but Professor Fagan testified that this did not impact his analysis. (*See* Evid. Hr'g Tr. at 38.)

21-22.) He drew these criteria from the ATF manuals, as well as from a statement made by a

prosecutor during oral arguments before the Seventh Circuit in *Davis* defining what, in her view,

was the proper comparison group.[18] (Evid. Hr'g Tr. at 25-26; Gov't's Hr'g Ex. Davis OA Audio

at 11:17-12:12.) For each such individual, he gathered information about their race, gender, and

age, as well as a complete criminal history showing their arrests, case outcomes, sentences, and

periods of custodial confinement.[19] (*Williams*, R. 338-2, Fagan's Report at 7.) He concluded that

the proper comparison pool was roughly 55 percent black, 17 percent Hispanic, and 27 percent

white. (*Id.* at 17-18.)

Professor Fagan conducted a series of tests "to determine whether race predicts selection

into the Stash House defendant pool." (*Id.* at 23.) This included conducting several regression

analyses to "see if there are particular types of information, such as demographic factors or

criminal history, that explain whether and why the selection of Stash House defendants is based

on race or ethnicity." (*Id.* at 25.) For each model, "all defendants were pooled for the analyses."

(*Id.* at 24.) He explains that "[i]n each instance, the outcome of interest is selection as a

defendant." (*Id.*) Professor Fagan also used Augmented Inverse Probability Weighting "to

---

[18] Professor Fagan originally testified that he obtained the additional criteria from "memoranda encouraging ATF to expand their search—their eligibility criteria to search for people based on those particular offense categories in addition to what's in the manual." (Evid. Hr'g Tr. at 27.) At a later point in the hearing, he stated that he had been mistaken in his earlier testimony and that there were no such memoranda; instead, he had obtained the additional targeting criteria from statements made by the prosecutor during oral arguments in *Davis*. (*Id.* at 78-79.) It is axiomatic that arguments made by counsel are not evidence, *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir. 2008), and a comment made by one prosecutor years after the stash house investigations were over is rather weak evidence of the targeting criteria used by ATF. However, for purposes of this opinion, the Court will accept Defendants' argument that Professor Fagan made a valid decision to incorporate the prosecutor's statement into his analysis.

[19] The ISP data did not contain information about Hispanic ethnicity, so Professor Fagan used a convention, employed by the U.S. Census Bureau and other entities, for estimating Hispanic ethnicity using last names. (*Williams*, R. 338-2, Fagan's Report at 8-9; *see also* Evid. Hr'g Tr. at 40-42.) In effect, he treated individuals as Hispanic if the probability that they were Hispanic exceeded a certain threshold based on data pertaining to common Hispanic surnames. (*Williams*, R. 338-2, Fagan's Report at 8.) "Hispanic (60%) means that, based on their last name, a person is more than 60% likely to be Hispanic." (*Id.*) The experts agreed that there is some level of error inherent in using this convention, usually involving the misclassification of Hispanics as white. (*See id.*; Tr. at 42-44, 397; *see also id.*, R. 555-1, Schanzenbach's Report at 21-22.)

estimate a first predictor of race (the treatment) adjusted for the covariates, and then the effects

of the adjusted treatment variable on the outcome (selection into the Stash House Program)." (*Id.*

at 33.) He also used Propensity Score Matching, which "takes into account all background

characteristics (i.e. covariates) other than race that might be correlated with race." (*Id.* at 35.) In

this test, the 94 stash house defendants were "matched on their propensity score" to members of

the comparison group. (*Id.*) Based on the results of these tests, Professor Fagan opines that "after

controlling for criminal propensity, race remains statistically significant, meaning that the ATF is

selecting defendants on the basis of race." (*Id.* at 30.) In his view, "the probability of selection of

a cohort of Stash House Program defendants with their observed racial and ethnic composition

from among a large pool of similarly situated potential eligibles is less than 0.1%[.]" (*Id.* at 37.)

It must be recognized at the outset that constructing a comparison group in a selective

enforcement case is an extremely difficult task. *See Hare*, 820 F.3d at 100; *Chavez*, 251 F.3d at

640. The government itself recognized that "the similarly situated group . . . is difficult to

define." (Evid. Hr'g Tr. at 201.) The record reflects that Professor Fagan made a commendable

effort to gather and analyze a large amount of data in an attempt to construct a proper

comparison group. Ultimately, however, the Court does not find his report to be persuasive

evidence of race discrimination. Critically, Professor Fagan's analysis rests on certain

presumptions that are not adequately supported by the record. His analysis presumes, among

other things, that the ATF selected each of the stash house defendants for participation in the

stings, and that the 94 stash house defendants were drawn independently of each other. As

Professor Schanzenbach points out, when these assumptions "are relaxed or removed, the results

no longer support an inference of racial discrimination." (*Brown*, R. 555-1, Schanzenbach's

Report at 13.)

### 1.    Assumptions about Defendants

Critical to Professor Fagan's entire analysis in an assumption that the ATF selected *each* of the 94 stash house defendants for participation in the stings. Professor Schanzenbach convincingly explains that "[t]reating all 94 individuals as a 'choice' or 'random draw' made by the ATF wrongly increases the sample size and statistically attributes choices to the ATF that it did not make." (*Id.* at 16.) Defendants believe that Professor Fagan's assumption was appropriate because the ATF "owned" the entire stash house operation, such that, in their view, the agency is legally responsible for the race of all participants and not just the initial targets.[20] (*See, e.g.*, *Brown*, R. 630, Defs.' Reply at 24.) Ultimately, the Court is unconvinced by this argument.

As a *factual* matter, the bulk of the 94 defendants were not recruited by ATF. Instead, the record reflects that the stash house investigations began with the ATF's selection of one or more initial targets, based on information provided to them by confidential informants. The remaining defendants were recruited by the targets themselves, or by other members of the conspiracy who were, in turn, recruited by the targets. In fact, the record reflects that the ATF never even met 32 of the 94 defendants—nearly one-third of the total defendant group—until the day of their arrest.

---

[20] Professor Fagan used this same terminology—that the ATF "owns" the stash house stings—to explain why he analyzed all 94 stash house defendants together rather than just analyzing the initial targets. (*See Brown*, R. 603-3, Fagan's Reply Report at 34 ("A close examination of the recruitment of the defendants shows, in fact, that the ATF 'owns' the entire case, and therefore the correct unit of analysis is each of the 94 defendants."); Evid. Hr'g Tr. at 101-02 ("[W]e would have to make a judgment call, and the judgment call is whether or not to cluster the defendants or by the cases. Our position was that the ATF agents . . . owned all the defendants in the cases because they had had extensive contact—63 out of 94—with individuals prior to the stash house operation.").) Professor Fagan's assumption that the ATF "owns" the stash house stings does not appear to be based on his expertise in criminology or statistics, but rather, on a legal argument advanced by Defendants. At one point during the evidentiary hearing he explained that "my position that we took in my report was that before one of these operations was launched, that the ATF undercover officer, agent . . . knew of and approved each of the members of the conspiracy . . . and so they were aware of the criminal histories or criminal activity of those defendants." (Evid. Hr'g Tr. at 94.) There is little evidence in the record to support this assumption, and in fact it is contradicted by Defendants' own brief, which recognizes that the ATF did not meet a full 31 of the defendants until the day of their arrest. (*Brown*, R. 630, Defs.' Reply at 27.) Defendants do not argue in their brief that ATF was actually aware of the criminal histories of these individuals, but rather, that agents "ratified" the choice of the initial target when they let these individuals participate in the stings. (*Id.*) The Court notes that Professor Fagan acknowledged at the hearing that although he read "several" of the takedown memoranda, he did not read them for all 24 cases. (*See* Evid. Hr'g Tr. at 146.)

(Evid. Hr'g Tr. at 100-01; *Brown*, R. 630, Defs.' Reply at 27.) Additionally, two of the stash house cases, involving a total of 14 defendants, were not initiated by the ATF at all. Instead, those investigations were initiated by the Federal Bureau of Investigation ("FBI") based on information provided by its own confidential informants.[21] (*See Williams*, R. 354-1, Gov't's Ex. 3, Tr. at 94-100; *Brown*, R. 511-5, Takedown Mem. at 78-83; *Flowers*, R. 1, Compl. ¶¶ 1-53; *Davis*, R. 1, Comp. ¶¶ 1-20; Evid. Hr'g Tr. at 49, 491-92.) The record reflects that the ATF did not become involved in these two cases until *after* the selection of the initial targets had already been made. (*Brown*, R. 511-5, Takedown Mem. at 78-83; *Flowers*, R. 1, Compl. ¶¶ 1-53; *Davis*, R. 1, Compl. ¶¶ 1-20.) In the Court's view, ATF cannot be said to have "selected" individuals it never met or individuals targeted by another governmental agency under any ordinary meaning of that term. *See Barlow*, 310 F.3d at 1011 (rejecting the defendant's statistical evidence where some individuals in the comparison group had been "approached by a uniformed Amtrak police officer whereas [Defendant] was approached by two plain-clothes DEA Transportation Task Force agents. [Defendant] leveled his allegations against the DEA, not Amtrak; observations of *Amtrak's* law enforcement activities are irrelevant to a claim that the *DEA* engaged in racial profiling." (emphasis in original)).

Defendants make arguments about "apparent agency" and the ATF "owning" the stash house stings, but these are *legal* arguments, and legal arguments do not affect probabilities. Professor Fagan's report is about probabilities. (*See, e.g., Brown*, R. 603-3, Fagan's Reply Report at 21-22 (opining on the "probability of randomly selecting defendants with this racial composition"); Evid. Hr'g Tr. at 54 ("We found it extremely unlikely to select a pool of defendants who were non-white, meaning black and Hispanic, compared to a pool of whites.").)

---

[21] Those cases were *United States v. Davis*, 13 CR 63, and *United States v. Flowers*, 11 CR 779. (*See Williams*, R. 354-1, Gov't's Ex. 3 at 94-100.)

As he explained at the hearing, his report describes—in very simple terms—the odds of a person randomly choosing certain color jelly beans by reaching into a jar containing jelly beans of various colors.[22] (Evid. Hr'g Tr. at 48-49, 54-56.) He attributes the high concentration of "jelly beans" of a certain color to purposeful selection. (*See id.* at 54 ("We found evidence—using the jelly bean analogy, the probability of a draw that was 91.5 percent versus 72.2 percent of the eligibles population, we found the probability of that being next to zero."); *id.* at 55 ("[T]he probability of a draw that looked at . . . this disparity in the two distributions was almost zero, which is a hint of discrimination in the selection process.").) But this analysis necessarily presumes that the person (here, ATF) actually reached into the jar to make the draw. If the person did not reach into the jar, and instead was *handed* a number of jelly beans by someone else, it would be wrong to assume that the person made a choice with respect to those jelly beans, or that the selection was non-random. But that is the fundamental premise underlying Professor Fagan's entire report.

With respect to the FBI cases, for example, Professor Fagan explained that he felt it was appropriate to consider the 14 defendants indicted in those cases, all of whom were black, as a "selection" made by ATF because "once the ATF agents took over the case, they could easily have rejected those persons if they didn't meet the ATF criteria." (*Id.* at 50.) This ignores the realities of these cases, which is that ATF did not meet with up to a third of the defendant group until the day of the arrest. (Evid. Hr'g Tr. at 100-01; *Brown*, R. 630, Defs.' Reply at 27.) But putting that aside, Professor Fagan is essentially stating that ATF could have put certain jelly

---

[22] The Court does not equate human beings to jelly beans, nor is there an intent to make light of the very serious interests at stake in this case. However, Professor Fagan's jelly bean analogy provides a useful simplification of complex statistical principles.

beans back in the jar had it chosen to do so; even assuming this was the case, it would not reveal anything about the probability of selecting particular jelly beans from the jar in the first place.[23]

On a different record, it might be appropriate to attribute the race of other members of the conspiracy to the ATF. Suppose, for example, that Williams brought two potential recruits to a meeting with Agent Valles, one white and one black. Suppose further that Agent Valles told Williams that the white recruit did not fit the bill for the robbery and refused to let him participate, while at the same time accepting the black recruit into the conspiracy. If this pattern was repeated throughout the stash house investigations, with ATF picking and choosing among prospective members of the conspiracies, it would provide strong evidence that the ATF exercised actual authority over the selection of defendants beyond the initial target, and potentially did so on a racially discriminatory basis. But there is no evidence before the Court to suggest that *any* potential crew member brought to a meeting in the 24 cases—white or black— was rejected by the ATF. (*See Brown*, R. 511-5, Takedown Mem. at 1-152.) At most, the record shows that the ATF simply accepted the selections of the initial target and continued to

---

[23] Professor Fagan did not run any tests omitting the 14 defendants from the FBI cases but he acknowledged that omitting them would have made the defendant pool "whiter." (Evid. Hr'g Tr. at 50-51, 122.) Professor Fagan testified at the hearing that Professor Schanzenbach ran those tests and "still found evidence of racial discrimination against black defendants," (*Id.* at 51), but this is not an accurate summary of Professor Schanzenbach's findings. Professor Schanzenbach made clear in his testimony that he ran various tests solely to determine how "sensitive" Professor Fagan's findings were—and he found them to be extremely sensitive, meaning that any slight change in the assumptions led to a significant change in the results. (*Id.* at 409, 413.) He tested one assumption at a time, including omitting the 14 defendants from the FBI cases, but accepted all other assumptions applied by Professor Fagan, including that clustering at the case level was unnecessary. (*Brown*, R. 555-1, Schanzenbach's Report at 17.) As explained herein, a number of Professor Fagan's conventions are problematic, including the lack of clustering and the decision to analyze all 94 defendants rather than just the initial targets. Professor Schanzenbach did not find evidence of discrimination at any level when he clustered by case level or analyzed just the initial targets. (*Id.*; Evid. Hr'g Tr. at 349.) There was a separate question raised at the hearing as to whether findings can ever be "statistically significant" at the 10 percent level, as Professor Schanzenbach found in some instances. (*See* Evid. Hr'g Tr. at 315-17, 421-23.) Although Defendants argued at the hearing that 10 percent is a sufficient marker of statistical significance (*see id.* at 535-36), Professor Fagan himself acknowledged that findings at the 10 percent level would only be significant if they were part of a "pattern of findings which include more stringent levels . . . 1 percent and 5 percent." (*Id.* at 459-60.) He acknowledged that "[a]s a member of an editorial board where I've reviewed hundreds and hundreds of articles, . . . if I saw an article that said we're going to base our finding on a finding of .10, I would say, no, I don't think that's reliable." (Tr. at 460.) This was one of the few points of agreement between the experts, as Professor Schanzenbach also opined that findings solely at the 10 percent level would be a "hard sell in the social science literature." (*Id.* at 426.)

perpetuate the stings. Under these circumstances, the Court does not find it appropriate to treat defendants other than the initial target as "selections" made by the ATF.

At the hearing, Defendants suggested that it was "foreseeable" to ATF that the conspiracies would form along racial lines. (Evid. Hr'g Tr. at 108, 112.) It is not clear that the concept of foreseeability, which arises from negligence jurisprudence, would apply to a claim alleging purposeful race discrimination under the Fifth Amendment. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278-79 (1979) (holding that state officials could not be held liable solely because a veterans preference law had a foreseeable negative impact on women); *United States v. Bd. of Sch. Comm'rs*, 637 F.2d 1101, 1119 (7th Cir. 1980) ("Disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." (citation and internal alteration omitted)); *Wade v. Cicero, Ill.*, No. 83 C 2760, 1985 WL 2717, at *7 n.3 (N.D. Ill. Sept. 24, 1985) ("In *Feeney*, the [Supreme] Court held that regardless of the presumption in common law that a person intends the natural and foreseeable consequences of his or her actions, such an awareness of consequences was not a 'discriminatory purpose' that violated the Equal Protection Clause."). Defendants made only a passing reference to foreseeability in their voluminous briefs (*see Williams*, R. 378, Defs.' Reply at 29), and Professor Fagan acknowledged that he did not conduct a statistical analysis to determine how the selection of the confidential informants and/or the initial targets would influence the racial makeup of the conspiracy under a foreseeability theory.[24] (*See* Evid. Hr'g Tr. at 109.) Although there is certainly racial homogeneity in many of the conspiracies, some do involve defendants of different races. According to Professor Fagan's report, *United States v. Corson*, No. 06 CR 930, involved one

---

[24] The Court notes that despite a suggestion to the contrary by defense counsel at the hearing (*see* Evid. Hr'g Tr. at 476), Defendants had information about the race of the confidential informants in their possession since the early stages of this case. (*See Brown*, R. 261, Order at 8-10, 12-13; *id.*, R. 171, Order at 2; *Williams*, R. 354-1, Gov't's Disc. Resps. at 60-69.)

Hispanic defendant and two white defendants, and *United States v. Elias*, No 13 CR 476, involves five Hispanic defendants, one white defendant, and three black defendants. (*See Williams*, R. 338-2, Fagan's Report at 13-14.) Without statistical evidence or legal analysis to support Defendants' foreseeability argument, the Court cannot conclude that ATF engaged in race discrimination on this ground. *See United States v. Laneham*, No. CV 16-2930 JB, 2017 WL 4857437, at *31 (D.N.M. Oct. 25, 2017) (rejecting argument of stash house defendant that ATF's selection of certain CIs "virtually guaranteed" the "investigation and prosecution of individuals of the same racial and cultural background," because, although it was "a plausible premise," the defendant failed to provide evidence showing "how severely—if at all—the use of three African-Americans out of five CIs would affect the racial makeup of the people with whom the CIs make connections.").

On the question of attributing the race of other members of the conspiracy to the ATF, a recent opinion from the Seventh Circuit is instructive. In *Conley*, which also involved a fictitious stash house sting conducted by the ATF, the defendant raised a defense of entrapment, arguing that he was not predisposed to commit a stash house robbery and was unfairly lured into committing the offense by the conduct of ATF agents. 875 F.3d at 401-02. The defendant was not the initial target of the sting, however, and was instead recruited by another member of the conspiracy. *Id.* The Seventh Circuit rejected the defendant's entrapment argument because it was "Conley's co-conspirators, and not the government, [who] recruited him" into the conspiracy, and "[t]here is no defense to entrapment by a private individual." *Id.* at 402. The court explained: "Although the government has control over its conduct when interacting with the first alleged entrappee . . . the government agency cannot possibly control what types of conduct have been used to induce conduct in someone several actors down a chain." *Id.*

Similarly, the Fourth Circuit recently rejected a claim of outrageous government conduct in a fictitious stash house case because the defendants raising the challenge "were not targeted by ATF but recruited by [the initial target], whom ATF targeted based on information that he was an active, armed drug trafficker." *Hare*, 820 F.3d at 103. The court further concluded that "it was not outrageous for the government to infer that [the initial target] would recruit people who were willing and had the requisite experience to rob an armed stash house." *Id.* This inference was "bolstered" by the defendants' own conduct in assenting to the plan in the ATF agent's presence and in planning the specifics of how the robbery would be executed. *Id.* Other courts have reached the same conclusion—that law enforcement agents do not "select" stash house robbery crew members who were recruited by other members of the conspiracy. *See United States v. Lamar*, No. 14 CR 726, 2015 WL 4720282, at *9 (S.D.N.Y. Aug. 7, 2015) ("Because co-conspirators—and not DEA agents or informants—approached these 76 defendants, it is clear that they were not targeted on the basis of any alleged discriminatory policy or practice of the DEA."); *United States v. Colon*, 71 F. Supp. 3d 269, 277, 282-83 (D. Conn. 2014) (rejecting equal protection claim of defendants in phony stash house case because "there is no evidence that the government did anything to select any of the seven defendants except for the two [initial targets], who themselves chose their own co-conspirators").

The Court finds this reasoning persuasive. In *Brown* and *Williams*, the ATF targeted Jones and Williams, both of whom came to the ATF's attention based on information provided by its confidential informants. Jones was known to affiliate with the Gangster Disciples, and the ATF had good reason to believe he was actively involved in dangerous criminal activity, as he had recently sold more than 20 firearms to a confidential informant working with the ATF. (*Brown*, R. 555-1, Report of Investig. at 144; *id.*, R. 511-5, Takedown Mem. at 95.) Williams

41

was also known to affiliate with the Gangster Disciples and had five prior felony convictions, including convictions for aggravated assault with a deadly weapon and unlawful use of a weapon following a felony conviction. (*Williams*, R. 332-5, Takedown Mem. at 126.) It was not unreasonable for the ATF to assume that Jones and Williams would "recruit people who were willing and had the requisite experience to rob an armed stash house." *Hare*, 820 F.3d at 103. The many damaging statements made by the men they recruited further bolstered the reasonableness of this assumption. *See id.*

For these reasons, the Court finds an insufficient basis in the record to attribute the race of defendants other than the initial target to the ATF. Professor Fagan's entire report relies heavily on the race of defendants who were not actually selected by ATF agents, and it does not provide any analysis specific to just the initial targets. As Professor Schanzenbach explained, considering only the initial targets would "significantly reduce the sample size" and would also change the racial composition, making the defendant group somewhat whiter,[25] and both of these things are significant "for statistical inference purposes[.]" (Evid. Hr'g Tr. at 297-98.) Indeed, Professor Fagan himself acknowledged that it may have been impossible to conduct a reliable statistical analysis with such a small sample. (Evid. Hr'g Tr. at 103 ("[J]ust analyzing the 24, I can't say. 24 is a low number. You would get a very unstable result.").) For this reason, the Court finds it difficult to rely on Professor Fagan's findings.

Another of Professor Fagan's critical assumptions is that the stash house defendants were drawn independently of each other, in other words, that "the selection of one defendant did not influence the selection of any other defendant[.]" (*Brown*, R. 555-1, Schanzenbach's Report at 19.) Professor Schanzenbach convincingly explains that "[i]f independence is assumed when in

---

[25] Professor Schanzenbach reports that the initial targets were 75 percent black, 16.6 percent white, and 8.3 percent Hispanic. (Jt. Hr'g Ex. 5.)

fact the data are grouped and correlated, a naïve regression assuming independence can lead to an erroneous conclusion that the results are statistically significant." (*Id.* at 19-20.) Professor Fagan believes that his assumption of independence was appropriate because "the [stash house] cases are often made up of individuals with weak ties to each other." (*Id.*, R. 603-3, Fagan's Reply Report at 5; *see also* Evid. Hr'g Tr. at 119 ("[T]here really wasn't evidence that these are tightly clustered groups of like-minded or behaviorally similar individuals.").) But the record does not bear this out.

Taking *Brown* as an example, the ATF presented the stash house robbery idea to Jones, who in turn recruited Brown and Taylor; they in turn recruited Washington and Davis. (*Id.*, R. 1, Compl. ¶¶ 8-10.) Law enforcement records show that Brown, Taylor, and Washington were all affiliated with the Gangster Disciples, and Brown and Washington admitted on the undercover recordings to having committed past home invasion robberies with Davis, who was Brown's cousin. (*Id.* ¶¶ 8-26; *id.*, R. 555-1, Records at 229-30; *id.*, R. 511-5, Takedown Mem. at 95-96.) Similarly, in *Williams*, the initial ATF target, Williams, recruited his uncle, Hummons, and Lee, a friend-of-a-friend from his neighborhood. (*Williams*, R. 354-1, Tr. at 466-68; *id.*, R. 354-1, Lee's Statement at 513.) In short, the record reflects that these Defendants were interrelated. Indeed, Professor Fagan acknowledged at the hearing that two individuals have "strong ties" if they commit crimes together. (Evid. Hr'g Tr. at 216.)

Professor Fagan offers various conclusions about the "probability of *randomly selecting* defendants with this racial composition," (*id.*, R. 603-3, Fagan's Reply Report at 20-21 (emphasis added)), but the record does not show that each of the 94 defendants *was* in fact randomly selected. Treating each defendant as an independent "draw" for statistical purposes, as Professor Fagan did, led to an overstatement of the racial anomalies associated with the stash

house stings. (*Id.*, R. 555-1, Schanzenbach's Report at 18-20; Evid. Hr'g Tr. at 324-27.) Because of these concerns, the Court cannot rely on Professor Fagan's findings about the probability of selecting the stash house defendants from among the comparison group.

### 2. Construction of the Comparison Group

The Court also has concerns about the comparison group constructed by Professor Fagan. The sheer number of people in the group, as he defined it, demonstrates the breadth of his analysis. (*Brown*, R. 510-2, Fagan's Report at 4-10.) He opines that ATF could have selected anyone among a group of 292,000 individuals living in an eight-county area to participate in the stings. (*Id.* at 8, 17.) But it seems implausible to assume that nearly 300,000 people—which is approximately 10 percent of the population of men aged 14 to 49 living in the relevant counties during the relevant period—would have been willing to commit a stash house robbery had they been given the opportunity. (*See* R. 555-1, Schanzenbach's Report at 3.) By its very nature, a stash house robbery is a highly dangerous crime that requires access to firearms, the potential use of deadly force, and a significant risk to one's own safety.[26] The offense also requires the participant to have sufficient knowledge of and contact with the illegal drug trade to sell a substantial amount of cocaine after the robbery. These factors have caused one judge on the Seventh Circuit to observe that "[n]o ordinarily law-abiding person" would be willing to commit a stash house robbery. *Mayfield*, 771 F.3d at 444 (Easterbrook, J. dissenting). In fact, among the group of potential eligibles identified by Professor Fagan, there were only 8,254 arrests for armed robbery and 541 arrests for home invasion with a firearm (and significantly fewer

---

[26] As one of the Defendants in *DeJesus* put it, "To go in a house full of guys that are strapped, that's suicide." (*Williams*, R. 354-1, Tr. at 639.)

convictions),[27] suggesting that it is a far smaller subset of individuals who would be willing to use firearms and violence to commit a robbery of potentially violent drug dealers if given the opportunity.[28] (*See* Jt. Hr'g Ex. 5.) Indeed, Professor Fagan acknowledged in a prior paper that "[r]obbery is not a crime that is committed casually, nor are robbers a random sample of the criminal population." (Evid. Hr'g Tr. at 182.)

Professor Fagan also took a very broad view of the relevant years for constructing the comparison group. Although no stash house stings were conducted until 2006, he included in the comparison group anyone with a conviction for the relevant offenses in 2000 or later. He testified at the evidentiary hearing that he "backed it up to 2000 so that we would have some opportunity to observe and measure [the potential eligibles'] criminal activity prior to the period of the stash house recruitments." (*Id.* at 21.) This may have been a valid decision in terms of criminology, but using data from as far back as 2000 led to a potential overinflation of the comparison pool. By way of example, someone with one criminal conviction from 2000 was counted as available for selection each year of the stash house sting operations, even though, by Professor Fagan's own admission, at the time the stash house investigations were underway they

---

[27] The Court accepts Professor Fagan's criticism that home invasion with a firearm does not present an exact match with a stash house robbery, given that a portion—he estimates approximately 16 or 17 percent—involve domestic disputes rather than a financial motive. (Evid. Hr'g Tr. at 230.) But there is some amount of guesswork in all of these comparisons, since this case involves a very unusual offense; as Professor Schanzenbach aptly noted, there is no "stash house robbery" offense reported in the crime data. (*Id.* at 253, 256, 374.) The Court considers the data pertaining to home invasions only in the overall context of the other offenses identified by Professor Schanzenbach. (*See Brown*, R. 555-1, Schanzenbach's Report at 7; Jt. Hr'g Ex. 5.)

[28] To the extent Defendants have relied on employment discrimination case law in their briefs, that body of law also holds that "interest" is an important factor that must be taken into account when constructing a comparison group. *See EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 302 (7th Cir. 1991) (holding that identifying the proper comparison group "means not only identifying *qualified* potential applicants for the job at issue but also identifying *interested* potential applicants" (emphasis in original)); *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 322-27 (7th Cir. 1988) (affirming district court's determination that plaintiff's regression statistics were unpersuasive in part because they failed to take into account relative lack of interest in the jobs at issue); *Bennett v. Roberts*, No. 96 C 6917, 2001 WL 290188, at *5 (N.D. Ill. Mar. 16, 2001), *aff'd*, 295 F.3d 687 (7th Cir. 2002) ("Interest in the jobs at issue and evidence of qualifications for those jobs are ordinarily important considerations for proof of discrimination and relevant to statistical analysis that finds such discrimination.").

may have been deceased, in prison, or no longer involved in criminal activity. (*See id.* at 174, 250-52.)

Controlling for the recency of criminal activity by those in the comparison group would have offered some predictor of whether they were willing and able to commit a stash house robbery in the years the stings were being conducted. It also would have correlated more closely with ATF criteria, which required that targets be "currently involved in criminal activity." (*Id.* at 235; *Brown*, R. 511-2, ATF Order at 5.) This information was contained in the data Professor Fagan was provided, but he chose not to use it in his analysis. (Evid. Hr'g Tr. at 224, 290.) Without an adequate basis for concluding that the 290,000 individuals in the comparison group were actually available for selection by the ATF and willing to commit a stash house sting between 2006 and 2013, it is difficult for this Court to rely on Dr. Fagan's findings to meet the required evidentiary threshold. *See Hare*, 820 F.3d at 100 (observing that proper comparison group for analyzing racial disparities in stash house sting operations would be individuals who would have been "receptive to a stash house robbery scenario" and who "ATF had the means of infiltrating"); *Colon*, 71 F. Supp. 3d at 283 (rejecting racial profiling claim of stash house defendants because defendants failed to make comparison to similarly situated individuals— "that is, individuals who were not Hispanic, who had similar prior criminal involvement, and whom the ATF could have targeted but did not").

Professor Fagan also took a very broad view of the proper geographic scope for constructing the comparison group. For instance, he included all of LaSalle County in his analysis because one defendant in one case brought in 2007 lived in LaSalle County. (Evid. Hr'g Tr. at 206-07.) Despite this rather tenuous link to the stash house sting operations, he assumed that for each sting, including those involving a predominately black gang in Chicago's

Englewood neighborhood, the ATF was just as likely to have drawn a participant from rural LaSalle County, located nearly 100 miles from Chicago. (*See id.* at 206-09.) This would appear to conflict with his opinion that "most people don't travel very far from their homes or from wherever their current residence is to commit a crime." (*Id.* at 221.) The inclusion of LaSalle County alone dramatically increased the number of whites in the comparison pool, as that county has a population that is 95 percent white. (*See* Defs.' Hr'g Ex. 4.)

Assuming that Professor Fagan did not have access to detailed neighborhood information for the potential eligibles,[29] at a minimum he could have run a regression at the county level. In other words, he could have compared the racial makeup of potential eligibles from the particular county where the stash house investigation in question was operated to the stash house defendants in those cases. This would have more closely approximated the pool that was geographically available for selection by the ATF in connection with a given case. It also would have taken into account, at least to some extent, the segregated living patterns within northern Illinois, which have resulted in significant racial variations in the eight counties Professor Fagan used for his comparison.[30] (*See* Evid. Hr'g Tr. at 277-78.) Without a more refined geographic

---

[29] At the evidentiary hearing, a number of comments were made about the fact that the home addresses of the eligibles group were not available to Professor Fagan. (*See, e.g.*, Evid. Hr'g Tr. at 154-55, 219.) To clarify the record, the Court *did* order ISP to turn over this data; however, the information was apparently not tracked for all cases and in Professor Fagan's view the data provided to him was "just not usable." (*Id.* at 219; *see also Williams*, R. 239, Mot. at 12.) The Court had also ordered ISP to turn over data showing the location of each arrest, but it was later revealed that ISP did not collect this data. (*See Williams*, R. 239, Mot. at 12-13; *id.*, R. 244, ISP's Resp. at 7.) Ultimately, Professor Fagan concluded that criminal propensity was an adequate proxy for geography and that he could proceed without specific geographic information. (Evid Hr'g Tr. at 219 ("[T]he number of prior arrests and convictions for violent crimes . . . would correlate with being in a high crime neighborhood, and then that to us was a sufficient geographic control[.]").)

[30] According to a document submitted by the defense summarizing census data, Cook County's population is 24 percent black, 58 percent white, and 21 percent Hispanic. (Defs.' Hr'g Ex. 4.) The remaining counties are overwhelmingly white. DuPage County's population is 4 percent black, 82 percent white, and 11 percent Hispanic. (*Id.*) Kane County's population is 5 percent black, 77 percent white, and 26 percent Hispanic. (*Id.*) Kendall County's population is 5 percent black, 87 percent white, and 13 percent Hispanic. (*Id.*) Lake County's population is 6 percent black, 80 percent white, and 17 percent Hispanic. (*Id.*) LaSalle County's population is 2 percent black, 95 percent white, and 6 percent Hispanic. (*Id.*) Will County's population is 11 percent black, 84 percent white, and 8 percent Hispanic. (*Id.*) Winnebago County's population is 11 percent black, 84 percent white, and 8 percent Hispanic. (*Id.*)

marker, it is difficult to rely on Professor Fagan's findings. *See Laneham*, 2017 WL 4857437, at
*27 ("For statistical evidence to have any hope for making a credible case for the ATF treating
similarly situated individuals differently, it must, at the very least, say something about
enforcement trends vis-à -vis individuals who (i) commit drug trafficking or firearm related
offenses, (ii) live in a city; and (iii) have a history of violent crime. [Defendant's] District of
New Mexico statistics, by contrast, reflect the demographic trends of offenders throughout New
Mexico and include offenders without histories of violent crime.").

Professor Fagan conducted a number of detailed regression analyses to create a closer
comparison between members of the eligibles group and the stash house defendants with respect
to various factors. (*See id.* at 54-69.) But again, he did not account for geographic differences
when making his comparisons.[31] (*Id.* at 279-80.) These tests also assumed complete
independence among the defendants, which, as explained above, is not an assumption that is
adequately supported by the record. (*See* R. 555-1, Schanzenbach Report at 19-21; Evid. Hr'g
Tr. at 310-11, 323.) Additionally, for the matching test, which eliminates individuals who
committed narcotics possession offenses and comes closest to identifying individuals in the
comparison group with the propensity to commit a stash house robbery, Professor Fagan
compared the 94 defendants as a whole, without any delineation of whether they were an initial

---

[31] Professor Schanzenbach explained the problem with the lack of a geographic marker in the matching analysis as
follows: "[I]f you do a matching analysis where you're saying, here's somebody with a certain propensity, I'm going
to match them to the eligibles data, you could identify someone in Joliet, right, who was . . . equal to somebody in
Rockford and the Rockford person is the defendant, but you're actually going to match them and say that the only
reason the person in Joliet wasn't chosen was because of race[.]" (Evid. Hr'g Tr. at 275.) Professor Fagan believed
that criminal propensity was an adequate proxy for geography, but he acknowledged at the hearing that it was
"possible" that he had matched, for example, "a Black Disciple from Englewood with a member of a white
supremacist gang in Joliet" when conducting his matching analysis. (*Id.* at 466.)

target, recruited by another member of the conspiracy, or even identified by ATF prior to the takedown.[32] (*See* Evid. Hr'g Tr. at 31.)

As a "counterfactual" to Professor Fagan's findings, Professor Schanzenbach conducted his own basic analyses of the defendant group and various subsets of the eligibles group. (*Brown*, R. 555-1, Schanzenbach Report at 5-8.) He found that black, white, and Hispanic defendants in the stash house cases had statistically similar criminal histories, and that on average, black defendants had more convictions, arrests, and sentences, and were more likely to have been convicted or arrested for a weapons offense than white defendants. (*Id.* at 5.) In the eligibles group, he found that those with an arrest for a violent offense (which he and Professor Fagan defined as murder, rape, robbery, assault, and battery) were 71 percent black and 15 percent Hispanic.[33] (*Id.* at 8.) Of those arrested for weapons offenses, 72.5 percent were black and 15 percent were Hispanic. (*Id.*) Of those arrested for home invasion with a firearm, 75.4 percent were black and 12 percent were Hispanic. (*Id.*) Of those convicted of armed robbery, 72 percent were black and 16 percent were Hispanic. (Jt. Hr'g Ex. 5.) These statistics closely track the racial makeup of the stash house defendants. (*See Williams*, R. 338-2, Fagan's Report at 14.) These basic comparisons do not conclusively prove that the ATF did *not* discriminate on the

---

[32] In the matching model, Professor Fagan also did not account for the fact that certain individuals appeared more than once in the data. For example, if a person had a qualifying conviction in 2000, they appeared 13 times in the data he used to do his matching analysis. (*See* Evid. Hr'g Tr. at 319-22, 513; *Brown*, R. 555-1, Schanzenbach's Report at 6.) Professor Schanzenbach provided compelling testimony that the failure to account for this anomaly made the results of the matching test unreliable. (*See* Evid. Hr'g Tr. at 320 ("Both Professor Fagan and myself agree that you at least have to cluster at the individual level because individuals are observed multiple times and we know that they're correlated with themselves. And if you don't do that, you're going to bias yourself towards finding a statistically significant result. The AIPW and matching analyses presented here do not account for clustering by individual.").) Professor Schanzenbach understood Professor Fagan to agree that there was a need to cluster by individual "[b]ecause he clusters at the individual level when he performs his logit regressions." (*Id.* at 321.) There was no available method to cluster by individual in the AIPW and matching analyses, however, which in Professor Schanzenbach's view made these methods inappropriate to test for discrimination in this context.

[33] The Court considers that these high percentages could themselves be attributable to racial bias within the criminal justice system as a whole. (*See* Evid. Hr'g Tr. at 256-57.) But this would not prove race discrimination by *the ATF*, which is the issue before this Court. As Professor Schanzenbach noted, ATF must "tak[e] the world as they find it and . . . that world has these [racial] disparities." (*Id.* at 257.)

basis of race, but they certainly provide a stark contrast to Professor Fagan's opinions that the racial makeup of the stash house defendants cannot be explained on any ground other than race discrimination.[34]

When litigants asserting an equal protection claim fail to make a proper comparison to a similarly situated group, courts have declined to find sufficient statistical evidence of discrimination, even where—as here—the raw data suggests startling racial anomalies. *See, e.g.*, *Hare*, 820 F.3d at 99 ("Without an appropriate basis for comparison, raw data about the percentage of black . . . defendants proved nothing." (citation and alteration omitted)); *United States v. Turner*, 104 F.3d 1180, 1185 (9th Cir. 1997) (rejecting claim of black defendants seeking to establish selective prosecution claim, even though over three-year period no white defendants had been prosecuted for crack cocaine offenses, and observing that "[t]he defendants have shown no more than the consequences of the investigation of violent street gangs, not that they were targeted because of race"); *Lamar*, 2015 WL 4720282 at *6, 16-17 (finding insufficient statistical evidence to support defendants' equal protection claim, even though all 95 defendants in stings conducted by the DEA were non-white); *United States v. Whitfield*, 29 F. Supp. 3d 503, 513-15 (E.D. Pa. 2014) (finding insufficient evidence of discriminatory effect in the absence of a proper statistical analysis, even though all 24 defendants in ATF stash house stings were black).

That is not to say that the statistics presented in this case are not deeply troubling. They are. The Court should not have to look to p-values, clustering, or other complex statistical principles to determine whether agents of the federal government engaged in race discrimination. Their conduct should be above reproach under any basic standard. At the same time, the Court

---

[34] Given the problems with Professor Fagan's analysis discussed at length above, the Court finds it unnecessary to probe the myriad other criticisms of his report outlined by Professor Schanzenbach. (*See generally Brown*, R. 555-1, Schanzenbach's Report at 5-24.)

has fundamental concerns about the reliability of Professor Fagan's findings—concerns that cannot be brushed aside simply because of an underlying discomfort with these type of sting operations. For the reasons outlined above, the Court reluctantly concludes that Defendants have fallen short of proving discriminatory effect. The Court credits the valiant efforts of defense counsel to show discriminatory effect. These efforts, however, substantially fail to meet the exacting standards set by the current applicable law.

### B.    Discriminatory Intent

Assuming Defendants satisfied the discriminatory effect prong, they "must still prove discriminatory intent in order to establish a violation of the Equal Protection Clause." *Chavez*, 251 F.3d at 645. Specifically, Defendants bear the "burden of proving the existence of purposeful discrimination." *McCleskey*, 481 U.S. at 292 (citation and internal quotation marks omitted). To meet this burden, a criminal defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* (emphasis in original). "'Discriminatory purpose' implies more than intent as awareness of consequences." *Chavez*, 251 F.3d at 645 (ellipses omitted). "It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of' its adverse effects upon an identifiable group." *Id.* (citations and ellipses omitted). Because a litigant rarely has direct insight into the mind of the decisionmaker, discriminatory intent may be "inferred from the totality of the relevant facts[.]" *Washington*, 426 U.S. at 242.

Under the applicable law, then, it is not enough for Defendants to show that the ATF was "'willfully blind' to the racially disparate impact of its stash house sting operations[.]" *Hare*, 820 F.3d at 100 n.6. Rather, Defendants must prove that the ATF pursued these investigations "at least in part *because of*, not merely in spite of, its adverse effects" on black and Hispanic

individuals. *Id.* (emphasis added) (citation omitted). Statistics alone will not suffice.[35] *Chavez*, 251 F.3d at 648 ("In this context, statistics may not be the sole proof of a constitutional violation[.]"); *Hare*, 820 F.3d at 100 ("[I]n cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer a discriminatory purpose." (citation, internal quotation marks, and alterations omitted)). Thus, to prevail on their motion, Defendants must present sufficient non-statistical evidence to demonstrate that the decisionmakers in their cases intentionally discriminated against them at least in part because of their race. *See McCleskey*, 481 U.S. at 298; *see also Hare*, 820 F.3d at 99 (where defendants presented statistical evidence showing a disproportionate number of blacks were arrested in stash house stings but offered "no other evidence that ATF's actions were 'invidious or in bad faith,'" they failed to establish a constitutional violation).

To prove discriminatory intent, Defendants point to two factors. First, they claim that comments made by the undercover agents involved in the stings—Agent Gomez in *Brown* and Agent Valles in *Williams*—prove that these agents "expressly targeted" them because of their race. (*Williams*, R. 338, Defs.' Mot. at 62-65.) Second, they argue that ATF agents substantially deviated from ATF guidelines in these investigations, and that these deviations prove that agents

---

[35] Defendants seem to argue that a statistical showing can prove both discriminatory effect and discriminatory intent. (*Brown*, R. 630, Defs.' Reply at 47.) In support, they cite to civil cases brought under Title VII of the Civil Rights Act of 1964. (*Id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).) But the Supreme Court has cautioned against extending Title VII case law to the equal protection context. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) ("We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today."). In *McCleskey*, which like this case involved the criminal justice system, the Supreme Court expressly held that the statistical evidence proffered by the defendant was insufficient to prove discriminatory intent. 481 U.S. at 297 (observing that defendant's statistics were "clearly insufficient to support an inference that any of the decisionmakers in [his] case acted with discriminatory purpose"). Other cases involving discretionary judgments within the criminal justice system have reached the same conclusion. *See Blackwell v. Klincar*, No. 84 C 8705, 1990 WL 92767, at *7 (N.D. Ill. June 22, 1990) ("Given the many variables that go into the parole release decision and the unique nature of each case, statistics purporting to show racial disparities cannot be relied on as evidence demonstrating discriminatory purpose in a particular case." (citing *McCleskey*, 481 U.S. at 292-97)).

targeted Defendants because of their race. (*Id.* at 40-62.) The Court addresses these points separately below.

### 1. Comments Made by ATF Agents

#### a. Agent Gomez's Comments in *Brown*

Defendants first point to certain comments made by Agent Gomez, who is Hispanic, during the recorded conversations. (*Williams*, R. 338, Defs.' Mot. at 64-65.) In the context of explaining that he did not want the drug cartel to find out he was behind the robbery, he stated during his first meeting with Jones, "[W]hat I like about you is that nobody can put me and you together." (*Brown*, R. 338-5, Tr. at 8.) Later in the conversation he said, "[L]et me ask you this: were you . . . lookin' to be in it, or were you guys gonna put us in touch with some guys? Because what I like . . . is that nobody could put me and you together. . . . So, who you come with nobody's gonna be able to put, put me and them together." (*Id.* at 11-12.) Agent Gomez also made statements indicating that he needed to meet with every member of the robbery crew prior to the robbery. (*Id.* at 12-13.) This was important, he explained, because the cartel guards inside the stash house were, in his words, "Mexicans . . . like me."[36] (*Id.* at 12.) Agent Gomez stated that he did not want Defendants to confuse him with the guards inside the stash house, because he didn't want to "take [a] round"—or get shot—by mistake during the robbery. (*Id.* at 13.) He made similar comments during the meetings with other crew members. (*Id.* at 17, 20.)

They believe that the clear import of Agent Gomez's comments, taken together, was that Agent Gomez "targeted Mr. Jones *because* he was Black," and that he "wanted Jones to recruit Black people." (*Id.* at 64-65 (emphasis in original).) The Court disagrees. There is no evidence to suggest that Agent Gomez was involved in the underlying investigation of Jones's sale of

---

[36] Defendants try to draw some nefarious inference from the fact that Agent Gomez chose "Blanco," which is Spanish for "white," as his nickname during the investigation, which is puzzling, since he clearly identified himself as Mexican during the recorded conversations. (*See Williams*, R. 338, Defs.' Mot. at 64 n.41.)

multiple guns to a confidential informant, or that he was involved in the initial decision to target Jones for investigation. (*See Brown*, R. 555-1, Report at 144; *id.*, R. 511-5, Takedown Mem. at 94-95.) As far as the record reveals, his role was simply to act as a disgruntled drug courier to facilitate the sting. (*Id.*, R. 511-5, Takedown Mem. at 95.) Additionally, it was Jones, and not the ATF, who recruited the other participants. Therefore, Agent Gomez's personal comments do little to prove that the decisionmakers in this case targeted Defendants because of their race. *See McCleskey*, 481 U.S. at 292; *Barlow*, 310 F.3d at 1011.

Additionally, when viewed in context, it is apparent that Agent Gomez's comments were part of a ruse to make his story plausible rather than evidence of race-based animus. Agent Gomez was essentially trying to offer an explanation for why he would offer the robbery to a group of strangers whom he had no apparent reason to trust. He explained that he wanted to commit the robbery with Defendants, in essence, because they had no readily discernible connection to him.[37] He made it clear at other points, without any reference to race, that the details of the robbery were up to the crew members, including who Jones decided to recruit to participate. (*See, e.g., Brown*, R. 555-1, Tr. at 351 ("[O]bviously, I'm 'a leave it up to you . . . who . . . the other guy's gonna be[.]").) Agent Gomez also needed to meet with as many crew members as possible to gather evidence against them, something he obviously could not tell them. So instead, he told Defendants that he wanted to meet the other crew members so that they recognized him during the robbery.

Agent Gomez worked on other stash house investigations in this District, and he followed the same basic script for his work in those cases. For instance, in *United States v. Corson*, No. 06

---

[37] Ironically, Agent Gomez's narrative was apparently convincing to Defendants. During the meeting on August 12, 2012, Brown explained to Agent Gomez why he felt Agent Gomez's story was legitimate. (*Brown*, R. 555-1, Tr. at 385.) He said, "[N]o racist shit, but you Mexican. Like you gotta be Mexican to . . . get close to the Mexicans to get they shit. . . . 'Cause you would've been black, I would've been skeptical of you[.]" (*Id.* at 386.)

CR 930, which involved two white defendants and one Hispanic defendant, he said, "I need a crew that ain't gonna come back to me. I don't know you guys. You don't know me. Nobody can put us together." (*Brown*, R. 555-1, Tr. at 445; *see also Williams*, R. 338-2, Fagan's Report at 13.) Later in the conversation, he said, "I want [the crew members] to see my face. 'Cause I don't wanna take a round . . . when I get inside." (*Id.* at 447.) He made similar comments to a group of defendants in *United States v. DeJesus*, No. 12 CR 511, who, like him, were Hispanic. (*See Williams*, R. 338-2, Fagan's Report at 14.) Specifically, he said to them, "Now what I like about you . . . nobody can put me and you together." (*Id.*, R. 354-1, Tr. at 638.) He reiterated the same thing several times during the conversations. (*Id.* at 643 ("[W]hat I like about you, bro, is like nobody can put me and you together."); *see also id.* at 661 ("[T]hat's what I like about you. Nobody can put me and you together."); *id.* at 678 ("[N]obody can put me and you together, and that's great.").) During another conversation he said he needed to meet the remaining member of the robbery crew because, in his words, "I want him to see my face, 'cause the other guys . . . they're . . . Mexican just like me . . . [and] I don't want [to] accidentally take a round." (*Id.* at 746.) The fact that Agent Gomez made basically the same comments to defendants of other races undercuts Defendants' argument that his comments prove he targeted them because they are black. That is not to say that the Court condones the ATF's tactics. But considered in context, the Court finds that Agent Gomez's comments fall short of establishing that the decisionmakers in *Brown* acted with a racially discriminatory purpose. *See McCleskey*, 481 U.S. at 292.

### 2. Agent Valles's Comments in *Williams*

Agent Valles is not normally assigned to the Chicago area and instead was here on temporary assignment as part of the fall 2012 law enforcement "surge." (*Williams*, R. 354-1, Gov't's Disc. Resps. at 43-44, 52.) *Williams* was the only stash house case he worked on in this District. (*See id.*, R. 338, Defs.' Mot. at 66.) Defendants point to certain comments he made during a meeting on November 8, 2012. (*Williams*, R. 338-5, Tr. at 3.) Williams brought a man, identified in the complaint as "Individual B," to meet Agent Valles, but Individual B did not show up on the date of the robbery and was thus never arrested or charged.[38] (*See id.*, R. 1, Compl. ¶¶ 35-37.) During the conversation, Individual B asked Agent Valles whether the people he worked for were "Mexican or something." (*Id.*, R. 338-5, Tr. at 3.) Agent Valles responded, "Yea[h] they Mexicans just like me." (*Id.*) The men then went on to discuss how the robbery would be executed, and Individual B asked Valles's opinion about certain tactics. (*Id.*) Agent Valles responded, "[H]owever you guys with it—that's why I'm comin' to you." (*Id.*) He added, "You know, I roll with my cuz but this shit can't come back on me . . . if they see some other Mexicans doin' it, they're gonna know that they're with me." (*Id.*) Later in the conversation, Individual B expressed concerns about how the robbery crew members would approach the stash house without being detected. (*Id.* at 528.) He said, "[W]e just gonna walk up to these peoples houses without them bein' alert, two black, some black guys?" (*Id.*) He and Williams then discussed how they would need to take the cartel guards by surprise. (*Id.*) Agent Valles responded, "[H]owever you all wanna do it . . . this [is] your show." (*Id.*)

---

[38] Individual B is identified by name in the takedown memorandum, but given that he was never arrested or charged, the Court declines to name him here. (*See Williams*, R. 332-5, Takedown Mem. at 126.) Individual B's criminal record shows four felony convictions, including murder, manufacture/delivery of cocaine, and unlawful use of a firearm following a felony conviction. (*Id.*) He also had arrests for battery, aggravated kidnapping, aggravated battery, carjacking, and unlawful use of a weapon. (*Id.*)

Defendants believe that Agent Valles's comments demonstrate "in no uncertain terms" that he presented the stash house robbery opportunity to Williams "*because* Mr. Williams is black," and further, that "the race of the robbers was important, and they couldn't be Mexican[.]" (*Id.*, R. 338, Defs.' Mot. at 63 (emphasis in original).) Again, the record does not show that it was Agent Valles who actually selected Williams as a target for the investigation. Instead, ATF records reflect that on November 7, 2012, a confidential informant working with the ATF identified Williams to a different ATF agent as someone who had expressed an interest in committing a robbery. (*Id.*, R. 1, Compl. ¶ 8; *id.*, R. 354-1, Report of Investig. at 462.) At that point, the confidential informant set up a meeting between Williams and Agent Valles, who posed as a drug courier for a Mexican cartel. (*Id.*, R. 332-5, Takedown Mem. at 120-21.) As far as the record reveals, that was the first time Agent Valles met Williams. In other words, there is nothing in the record to suggest that it was *Agent Valles* who targeted Williams for investigation, and it was *Williams*, not Agent Valles, who recruited the other members of the conspiracy. Therefore, Agent Valles's personal motivations are not particularly probative as to whether the decisionmakers in the *Williams* case harbored a discriminatory intent. *See McCleskey*, 481 U.S. at 292; *Lamar*, 2015 WL 4720282, at *9.

Agent Valles's repeated mention of race is very regrettable. But the Court considers that it was Individual B, not Agent Valles, who first broached the subject of race. The Court also considers that when Agent Valles made these comments, he was in a rapidly evolving, potentially dangerous situation that required him to think quickly and adapt his story based on statements of the crew members. Agent Valles was obviously aware that all of these conversations were being recorded, and the Court finds it rather implausible that he would

simply announce during a recorded conversation that he had a racially discriminatory motive for pursuing the investigation.

Additionally, when considered in context, it is apparent that Agent Valles's comments were part of an attempt (however inartful) to provide a plausible explanation for why he was offering the robbery to a group of strangers. In effect, he was explaining that it was helpful to him that the crew members (at least those whom had met thus far) were not of the same race as him, because there would be no readily discernable basis to connect them. As far as his comment went, there also would have been no basis to connect him to crew members who were white, Asian, or of some other non-Mexican ethnicity had Williams decided to recruit such individuals. Obviously his comment had no basis in fact, because there was no actual Mexican cartel and no actual stash house. Agent Valles was simply trying to assure the potential crew members that everything was in order, and that he was choosing to offer them the robbery opportunity for legitimate reasons. Agent Valles stated several times during the recorded conversations that it was up to Williams to decide how the robbery should be conducted, and he expressed in other ways—without reference to race or ethnicity—that his primary concern was ensuring that it did not appear he had anything to do with the robbery. (*See, e.g.*, *id.*, R. 354-1, Tr. at 530 ("I'm just lookin' for somebody else to get the job done so it don't fall back on me and my cuz.").) Agent Valles's decision to inject race into his discussions with Defendants was ill-advised, but considered in context, the Court finds that his comments fall short of establishing the type of racial animus by a decisionmaker that would draw into question the validity of the charges in this case. *See McCleskey*, 481 U.S. at 298.

### B. Departures From Protocol

Defendants' remaining argument is that ATF agents' significant departures from ATF protocols demonstrate that they were motivated by racial animus in pursuing these investigations. (*Williams*, R. 338, Defs.' Mot. at 45-61.) The Supreme Court has recognized that a significant failure by decisionmakers to follow established protocols can give rise to an inference of discriminatory purpose. *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The specific sequence of events leadings up [to] the challenged decision also may shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). Defendants believe that deviations from protocol by the ATF provide "circumstantial evidence of a 'clear pattern' of discriminatory behavior under *Arlington Heights*." (*Brown*, R. 630, Defs.' Reply at 65.)

ATF guidelines provide that the stash house stings are intended to "concentrate on identifying persons and infiltrating groups that collectively and/or as a community focus their criminal activities on executing robberies, by means of force, for personal gain." (*Brown*, R. 511-2, ATF Order at 3-4.) Agents conducting the stings are directed to "target persons who show a propensity of doing harm to the public through violent behavior/armed robberies and whose activities have been documented either through criminal history, criminal reputation, or self-incrimination." (*Id.*) ATF guidelines define "violent crime" as "offenses that involve force or threat of force," including murder, forcible rape, robbery, aggravated assault, and arson. (*Id.*) ATF guidelines further provide that at least two members of the group must be "identified as violent offenders," at least one target must have a past violent crime arrest or conviction, and all targets must be "currently involved in criminal activity." (*Id.* at 4-5.) The operations manual used

to conduct the stash house stings provides that ATF agents must ensure that targets "are a viable robbery crew or violent criminals." (*Id.*, R. 511-1, ATF Manual at 33.) Training materials used to prepare ATF agents to conduct the stings provide that targets "must have the ability to commit a home invasion by . . . having possession of, or access, to firearms." (*Id.*, R. 511-3, Zayas Training Materials at 7.) ATF guidelines instruct that "[c]riminal histories alone are not indicative of the ability, commitment, and experience of the subjects being investigated to execute the robbery." (*Id.*, R. 511-2, ATF Order at 7.)

These criteria, on their face, "do not suggest any discriminatory motive" on the part of the ATF. *Hare*, 820 F.3d at 101. Thus, the question is whether ATF agents so departed from established criteria that the Court could infer that they acted with a discriminatory motive. *Arlington Heights*, 429 U.S. at 267. As stated above, Defendants must prove more than just that ATF discriminated in some general way to prevail on their motion. *McCleskey*, 481 U.S. at 292. Instead, each defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* (emphasis in original). The Court therefore focuses specifically on the conduct of the ATF agents in *Brown* and *Williams*.[39]

---

[39] Defendants provide a detailed "departure analysis" containing a description of what they deem to be procedural deviations in all 24 stash house cases. (*See Williams*, R. 338, Defs.' Mot. at 40-62.) As with their statistical analysis on discriminatory effect, this analysis does not make any distinction between initial targets and defendants recruited by other members of the conspiracy. For example, if a defendant was not known or identified by ATF agents until the day of the takedown, it would be inappropriate to fault ATF for failing to ensure that this individual had the requisite criminal record to participate in the conspiracy. (Whether the decision to ensnare such individuals in a sting operation is an appropriate law enforcement strategy is another matter.) It also would not be appropriate for this Court to accept evidence of procedural irregularities in *other* stash house cases as proof that the decisionmakers in *Williams* and *Brown* had a discriminatory purpose in pursuing these investigations. *See McCleskey*, 481 U.S. at 292; *see also Colon*, 71 F. Supp. 3d at 280 (in fictitious stash house case, rejecting defendant's argument about government's alleged misconduct in other stash house operations because "it is axiomatic that a criminal defendant does not have standing to complain about alleged misconduct by the government against third parties"); *United States v. Laneham*, No. CV 16-2930 JB, 2017 WL 4857437, at *32 (D.N.M. Oct. 25, 2017) (in phony stash house case, declining to "consider the ATF's past acts in different cities when determining the ATF's intent in Albuquerque"). The Court therefore is not persuaded by Defendants' "departure analysis" for cases other than *Williams* or *Brown*.

First, Defendants make much of the fact that there is no evidence showing that they were working as "established" robbery crews prior to the stings.[40] (*Williams*, R. 338, Defs.' Mot. at 48-51.) As to *Brown*, however, there is evidence (namely, Defendants' own recorded statements) to suggest that at least three members of the group *had* committed home invasion robberies together in the past. (*Brown*, R. 555-1, Tr. at 260-80.) Regardless, ATF guidelines do not in fact require agents to investigate only those defendants who are already committing armed robberies together as part of an *established* crew. Rather, the guidelines only require that the group constitute a "viable" robbery crew, in other words, that the group be capable of committing the robbery.[41] (*Brown*, R. 511-1, ATF Manual at 33.) Defendants' criminal histories and their many inculpatory statements made during recorded conversations provide ample basis for the ATF's conclusion that they constituted "viable" robbery crews.

As to *Brown*, the record reflects that Jones had no prior felony convictions, but he had arrests for two violent offenses, assault and aggravated battery. (*Id.*, R. 511-5, Takedown Mem. at 95.) ATF guidelines specifically permit consideration of a target's arrests. (*Id.*, R. 511-2, ATF Order at 5.) The ATF also had good reason to believe that Jones was presently involved in criminal activity, as he had recently sold more than 20 guns to a confidential informant. (*Id.*, R. 555-1, Report of Investig. at 144.) Jones told Agent Gomez that he could provide him with a crew to commit the robbery and that he knew people who had "done this shit before." (*Brown*, R.

---

[40] Defendants also offer anecdotal evidence about the racial makeup of two groups of "real" stash house robbers arrested in the Chicago area in unrelated cases. (*See Williams*, R. 338, Defs.' Mot. at 44-45.) Defendants believe that there are statistical anomalies when these "real" stash house robbers are compared to the stash house defendants. (*Id.*) The Court agrees with Professor Schanzenbach that such a small sampling does not provide an appropriate basis for comparison. *See Robinson v. Sinclair & Valentine, L.P.*, No. 90 C 4005, 1993 WL 47293, at *2 (N.D. Ill. Feb. 22, 1993) ("Where statistics are presented concerning an extremely small group, they have questionable value."). Notably, Professor Fagan did not use this anecdotal evidence as part of his statistical analysis. (*See Brown*, R. 555-1, Schanzenbach's Report at 5 n.2.)

[41] "Viable" is defined as "capable of existence and development as an independent unit," or "having a reasonable chance of succeeding." *See Viable*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (10th ed. 1997).

555-1, Tr. at 184.) He then recruited Brown and Taylor, who in turn recruited Washington and Davis. Brown's criminal history included convictions for armed robbery, residential burglary, and aggravated unlawful restraint. (*Id.*, R. 511-5, Takedown Mem. at 96.) Taylor's criminal history included convictions for a drug offense and possession of a firearm after a felony conviction. (*Id.*)

ATF policy specifically permitted agents to consider a target's own statements when deciding whether he or she met the targeting criteria, (*id.*, R. 511-2, ATF Order at 3), and these men made many damaging statements in the undercover recordings. Jones made inculpatory statements describing his involvement in a recent retaliatory shooting near his home that had left an innocent bystander paralyzed. (*Id.*, R. 555-1, Tr. at 177-78.) A check of Chicago police department records confirmed that there had been a shooting that matched the details provided by Jones. (*Id.*, R. 511-5, Takedown Mem. at 94.) The other men described prior home invasion robberies they had committed, and also gave indications that they were active in the illegal drug trade: They knew the current market price for a kilogram of cocaine, and they were able to line up a buyer to purchase between 10 and 15 kilograms of cocaine after the robbery. (*Brown*, R. 555-1, Tr. at 259-80; *Williams*, R. 354-1, Tr. at 248.) Their ability to facilitate a sale of that magnitude reasonably suggested that this was not their first time selling illegal drugs.

ATF agents also had a basis to believe that the group had access to firearms, as Jones had recently sold multiple guns to the confidential informant. ATF records reflect that the informant continued to purchase guns from Jones while the stash house sting was underway, including purchasing an automatic rifle and multiple firearms with obliterated serial numbers. (*Williams*, R. 354-1, ATF Operational Plan at 197.) On the day of the arrest, Brown told Agent Valles that the group had brought three guns with them, and when they were arrested, agents found two

loaded 9-millimeter handguns and a sawed-off shotgun in Jones's vehicle. (*Brown*, R. 1, Compl. ¶ 29.)

Defendants criticize ATF agents for not including Washington and Davis in the "takedown memo" that was prepared prior to the day of their arrest. (*Brown*, R. 518, Defs. Mot. at 57 n.35; *see also id.*, R. 511-5, Takedown Mem.) But under ATF guidelines, the takedown memo should include "[c]omplete identification and criminal history of all *known* suspect(s)." (*Id.*, R. 511-2, ATF Order at 8 (emphasis added).) The takedown memo in *Brown* was prepared on July 30, 2012, and it identified the *known* suspects at the time the memo was written, which were Jones, Brown, and Taylor. (*Id.*, R. 511-5, Takedown Mem. at 95-96.) ATF agents informed their superiors in the memo that another meeting was "tentatively scheduled for August 1, 2012, where identification of all parties involved will be confirmed." (*Id.* at 95.) The record reflects that Agent Gomez met Washington for the first time at the August 1, 2012, meeting. (*Id.*, R. 1, Compl. ¶ 15; R. 555-1, Tr. at 259-62, 364.) Thereafter, Washington was identified in the operations plan prepared by ATF agents prior to the day of the arrest. (*Id.*, R. 555-1, ATF Operational Plan at 205.)

The record further reflects that Agent Gomez tried to meet with Davis at the August 1, 2012, meeting, but Davis failed to show up. (*Id.*, R. 555-1, Tr. at 349-52.) Agent Gomez met Davis for the first time on the day of arrest and confirmed his desire to participate in the stash house robbery. (*Id.* at 407-12.) ATF guidelines specifically provide that the undercover agent may use the day of arrest as "an opportunity to speak with all members of the organization in the event that all subjects were not present at prior meetings." (*Id.*, R. 511-2, ATF Order at 7.) Defendants argue that Agent Gomez "appears to have undermined his ability" to meet Davis on August 1, 2012, by failing to wait for him. (*Id.*, R. 510, Defs.' Mot. at 18.) But the record reflects

that Agent Gomez did ask to meet with Davis at that meeting, and left only after Brown said that his calls to Davis were going to voicemail and he did not know where Davis was. (*Id.*, R. 555-1, Tr. at 349-52.) Agent Gomez made clear that he needed to meet Davis at the next meeting, which he in fact did. (*Id.* at 352, 407.)

Based on the record, the Court finds that ATF had an adequate basis to conclude that the *Brown* Defendants constituted a viable robbery crew, that at least two members of the group were "violent offenders," at least one member of the group had a past violent crime arrest or conviction, and the group had access to firearms. (*Id.*, R. 511-2, ATF Order at 5.) In short, the Court does not find that the targeting of this group, or the manner in which the sting was conducted, so deviated from ATF policies as to suggest a racially discriminatory purpose by the decisionmakers in the case.

As to the *Williams* investigation, the record shows that the ATF initially targeted Williams, who had five felony convictions, including convictions for aggravated assault with a deadly weapon and unlawful use of a weapon following a felony conviction. (*Williams*, R. 332-5, Takedown Mem. at 126.) Williams recruited Hummons, who had previous convictions for home invasion, armed robbery, and other offenses. (*Id.*, R. 12, Report at 5-8.) They in turn recruited Lee to act as the driver, who they said was experienced in committing robberies. (*Id.*, R. 354-1, Tr. at 488-89.) Indeed, Lee gave a post-arrest statement admitting that he had previously acted as the driver in armed robberies of drug dealers for a mutual friend of Williams's. (*Id.*, R. 354-1, Lee's Statement at 513.) Lee also had multiple convictions for drug offenses and arrests for attempted aggravated robbery and aggravated assault. (*Id.*, R. 13, Report at 3-4.) There was also reason to believe that the men were engaged in criminal activity at that time. Williams told Agent Valles that he possessed numerous guns, which itself would be unlawful for someone

64

previously convicted of a felony. *See* 18 U.S.C. § 922(g)(1). In recorded statements, Hummons told Agent Valles that committing robberies "is what I do." (*Id.*, R. 354-1, Tr. at 476-86, 496.) There was also reason to believe the group had access to firearms. Williams told Agent Valles that he had "guns like a motherfucker," including assault rifles. (*Id.* at 466.) When the men were arrested, agents found a 9-millimeter semi-automatic handgun loaded with 16 rounds of ammunition in their vehicle. (*Id.*, R. 1, Compl. ¶ 65.)

Defendants complain that ATF agents did not identify Hummons or Lee before they were arrested. (*Id.*, R. 338, Defs.' Mot. at 17-18.) But at the time the takedown memo was written— November 9, 2012—Agent Valles had not yet met either Hummons or Lee. (*See id.*, R. 332-5, Takedown Mem. at 120-28.) Williams had brought two other men to meetings prior to that date, but these men ultimately did not show up on the date of the robbery. (*See id.*; *id.*, R. 354-1, Tr. at 475-85, 522-61.) ATF agents were able to identify one of the men, and he is listed as a target in the takedown memorandum; this man had an extensive criminal record, including convictions for murder, manufacture/delivery of cocaine, and unlawful use of a firearm following a felony conviction. (*See Williams*, R. 332-5, Takedown Mem. at 126.) The takedown memo stated that Agent Valles was trying to arrange another meeting with Williams "and other members of the robbery crew," at which time "additional attempts will be made to identify the other members of the crew." (*Id.* at 125.) That occurred on November 12, 2012, when Agent Valles met Hummons for the first time and Hummons identified himself only as "Jake." (*Id.*, R. 354-1, Tr. at 475.) At that same meeting, Agent Valles tried to meet with Lee, but Williams and Hummons rebuffed him and said there was no need for him to meet Lee because Lee would only be acting as the driver and would not be going inside the stash house. (*Id.* at 488.)

ATF protocols provide that agents should try to identify all targets of the investigation, but should use discretion "to avoid an investigation being compromised." (*Brown*, R. 511-2, ATF Order at 7.) Agent Valles could hardly ask crew members for their first and last names when they appeared for a meeting without arising suspicion. Agents were also required to list all *known* targets in the takedown memorandum, (*id.* at 8), but they obviously could not list individuals they had not yet met or identified. Nothing about the fact that agents were unable to identify Hummons or Lee by name until the day of their arrest suggests that the agents targeted them because of their race. Again, ATF guidelines specifically provide that undercover agents may use the day of arrest as "an opportunity to speak with all members of the organization in the event that all subjects were not present at prior meetings." (*Id.* at 7.) Thus, the actions of agents in these cases did not deviate from ATF policy.

Based on the record, the Court finds that the ATF had an adequate basis to conclude that the group targeted in *Williams*—including individuals who did not show up on the date of the robbery for reasons beyond the ATF's control—constituted a viable robbery crew, that at least two members of the group were "violent offenders," at least one member of the group had a past violent crime arrest or conviction, and the group had access to firearms. The Court does not find that the targeting of this group, or the manner in which the sting was conducted, so deviated from ATF policies as to suggest a racially discriminatory purpose on the part of the decisionmakers in the case. Therefore, the Court finds that Defendants' evidence falls short of proving the discriminatory intent necessary to establish a constitutional violation. For these reasons, the motions to dismiss are denied.

## IV.    Post-Hearing Discovery Motion

As a final matter, following the evidentiary hearing held in December 2017, Defendants moved to reopen discovery.[42] (*See Flowers*, R. 706, Defs.' Post-Hearing Disc. Mot.) The government objects to the motion as untimely, unnecessary, and unduly burdensome. (*Id.*, R. 674, Gov't's Resp. to Defs.' Post-Hearing Disc. Mot. at 1.)

The issue of discovery arose at the evidentiary hearing, when defense counsel made several references to a discovery request Defendants previously made in which they sought information about individuals who—as counsel described it—were "rejected" by ATF agents. (*See, e.g.*, Evid. Hr'g Tr. at 487.) Counsel suggested that in denying this particular discovery request, this Court had deprived Defendants of critical information they needed to prove their racial profiling claim. (*Id.*) This is not an entirely accurate account of the record. To clarify, in February 2015, Defendants filed a 28-page motion seeking a vast amount of discovery materials from the government. (*Williams*, R. 177, Disc. Mot.) Within the motion, Defendants noted that the government had contended "that the proper comparison group consists of people who are in some way associated with stash house robberies and the ATF's recruiters, but who did not participate or were not arrested." (*Id.* at 13.) Defendants "strongly dispute[d] this definition of the comparison group" but nevertheless sought broad discovery on that issue. (*Id.*) Among other things, they sought information about individuals who "demonstrated a willingness to conduct a robbery to a government informant or undercover officer, but were not offered the opportunity to conduct a robbery." (*Id.* at 13.) The Court granted a substantial portion of the requests contained

---

[42] At a status hearing held in January 2018, defense counsel stated that Defendants were "content with the record" and that, in their view, "what the Court has in front of the Court is sufficient to determine [discriminatory] effect and intent." (R. 670, Tr. at 7, 9.) But later at that same hearing, defense counsel expressed a need for post-hearing discovery, which appeared to conflict with her earlier statements. (*Id.* at 9-10.) When pressed by the Court as to whether Defendants wanted a ruling based on the present record or whether they wanted an opportunity to seek additional discovery, counsel asked for leave to adopt the post-hearing discovery motion filed in *United States v. Flowers*, 11 CR 779. (*See id.* at 11-12; *Flowers*, R. 706, Min. Entry.)

in Defendants' discovery motion but denied this particular request as too broad.[43] (*Williams*, R. 212, Tr. at 7.)

Between March 2015 and June 2017, the parties proceeded based on the universe of documents that the Court had ordered to be disclosed. Defendants acknowledge that at no point during that extended period did they seek to narrow their request or advise the Court that Professor Fagan needed this information to conduct a proper analysis. (*See Brown*, R. 670, Tr. at 14-15.) Then, nearly a year after Professor Fagan's report was completed and several months after the government filed its response brief and rebuttal report by Professor Schanzenbach, Defendants made a broad request for information about "any and all individuals whom an ATF Confidential Informant or ATF agent approached about a Stash House Operation in this District during the years 2006 to 2013." (*Id.*, R. 359, Renewed Disc. Mot. at 7.) The government objected, pointing out that Defendants already had detailed information about the 24 stash house cases brought in this District and information about an additional three stash house investigations that did not result in prosecution. (*See Williams*, R. 364, Gov't's Resp. at 5.) The government represented that it had no ready means of compiling additional responsive information, given the sheer number of confidential informants and ATF agents working in this large District during that seven-year period. (*See id.* at 6-7.) Ultimately, the Court denied the discovery request as both untimely and overly broad, out of concern that reopening discovery at that stage with such a broad request would derail this already five-year-old case. (*Id.*, R. 370, Order.)

---

[43] Notably, even though no order has ever been entered consolidating discovery matters in the many stash house cases in this District before this Court, Defendants chose to raise the bulk of their racial profiling-related discovery requests in *Brown* and *Williams*. (*See Brown*, R. 670, Tr. at 7-8.) In a few of the other cases, the presiding judges chose to adopt the discovery orders entered by this Court. (*See Brown*, R. 674, Gov't's Resp. to Defs.' Post-Hearing Disc. Mot. at 1 n.2.) In other cases, the presiding judges determined that Defendants were not entitled to *any* discovery or that only very limited discovery was warranted. (*Id.*) In still other cases, Defendants chose to make no discovery requests. (*Id.*) Given the strategic decisions that Defendants made, they can hardly be heard to complain that they were denied the ability to present their defense by virtue of this Court's rulings.

In their post-hearing discovery motion, Defendants seek vast discovery on four issues: (1) the "[f]ull universe of individuals with whom the ATF or its CIs had contact in this district regarding a Stash House Operation, from 2006-2013 (regardless of whether the ATF ultimately arrested the individuals)"; (2) information about the "entire pool of CIs available to the ATF" nationwide (3) the "[f]ull universe of ATF targeting criteria, including any criteria regarding gangs and geography"; and (4) "[i]nternal ATF documents recording ATF compliance or lack of compliance with its criteria and procedures[.]" (*Flowers*, R. 706, Defs.' Post-Hearing Disc. Mot. at 1-15.) Upon careful review of the parties' filings and the transcript of the evidentiary hearing, the Court declines to order further discovery. The government also provided the Court with several new documents for an *in camera* inspection. The Court carefully considered whether these documents should be disclosed to the defense, but concluded that these documents revealed too many confidential, investigative strategies that would not meaningfully change the Court's decision in these cases. The documents make it clear that ATF targeted ethnic gangs that it considered violent. They do not change this Court's findings with respect to discriminatory effect or intent. In any event, these documents will be preserved under seal as part of the record for any necessary appellate review.

As is fully outlined in the government's response brief, Defendants received extensive discovery in this case, including detailed information about the 24 stash house cases charged in this District, detailed criminal histories of all 94 defendants charged in those cases (many of whom have closed cases and are not part of the present litigation), sensitive materials from the ATF detailing the guidelines, policies, and training materials used in connection with the stash house stings, and information about the confidential informants, including their race, and instructions they were given by the agents. (*See* R. 674, Gov't's Resp. to Defs.' Post-Hearing

Disc. Mot. at 2-4.) Defendants' new discovery requests would not fill the gaps in Professor Fagan's report. The most significant problems this Court had with Professor Fagan's report, which are all fully outlined above, were his decision to include the cases initiated by the FBI, his decision to attribute the race of all 94 stash house defendants to the ATF, and his decision to treat the selection of each defendant as independent. There were also significant problems with his construction of the comparison group—as he chose to define it—and problems with the regression analysis he used to compare the defendant group to the comparison group. Providing Defendants with vast new discovery about ATF's nationwide supply of CIs or an entirely different population of individuals who may have had "contact" with an agent or CI about a stash house sting would not remedy any of these problems. In fact, some of these belated requests appear to be based entirely on questions posed by the judges during the evidentiary hearing, and not on statements made by the government or evidence suggesting that the government withheld relevant evidence. (*See Flowers*, R. 706, Defs.' Post-Hearing Disc. Mot. at 5 (as to request #1, stating that one judge had asked, "Isn't the real analysis of what the cadre of CIs that the ATF has?", an issue not previously raised by Defendants or addressed in any manner in their motion to dismiss); *id.* at 12 (as to request #4, stating that although they had received significant discovery on this issue already, "defendants return to this issue in light of Judge Ellis's question and similar questions raised during the hearing" by other judges). Discovery in this case was hotly contested and vigorously litigated over a period of years, and Defendants cannot seek a do-over at this late stage simply because they wish they had further developed the record on certain issues.

The government has also convincingly explained that the information sought by Defendants, at least as to certain requests, would be extremely burdensome and time-consuming

to compile. (*Id.* at 10-12.) As to request #1, assembling the information would require "asking every agent and task force officer who worked in the relevant ATF offices between 2006 to 2013 (some of whom are now retired), and every CI and 'associated' person who worked with them, to draw on their memories to compile a list of every person they approached about a home invasion." (*Id.* at 10.) Such an undertaking would be "massive."[44] (*Id.*) And in the end, the information compiled would likely be incomplete at best. Even if all agents and CIs could be located and interviewed, it is not at all clear that they would have complete information needed to identify such individuals and determine their race. In other words, "[t]here is no way to accurately determine whether missing information is for Black, Hispanic, or White investigative subjects." (*Id.*) As to request #2, the government represents that there are currently about 2,000 active CIs, a number that ebbed and flowed over the seven-year time frame referenced in Defendants' discovery request. (*Id.* at 12.) The government represents that it has no electronic search engine to obtain information about the CIs, and instead would have to locate the paper file for thousands of CIs, and scour those documents to discern if any mention was ever made of a stash house robbery.[45] (*Id.* at 12.)

As to the two remaining requests, the government represents that it has no additional information about the ATF's targeting criteria responsive to request #3 that has not already been disclosed. (*Id.* at 12-13.) As to request #4, the government rightly points out that Defendants'

---

[44] Defendants argue that the government should have existing documentation pertaining to any stash house investigation that was initiated. (R. 679, Defs.' Reply in Supp. of Mot. for Post-Hearing Disc. at 6-7.) But Defendants' discovery request, as drafted, seeks a far larger subset of materials. Specifically, Defendants seek information about "the full universe of individuals with whom the ATF or its CIs *had contact* in this district regarding a Stash House Operation" during a seven-year period. (*Flowers*, R. 706, Defs.' Post-Hearing Disc. Mot. at 3 (emphasis added).) There is nothing before the Court to suggest that the government has ready access to documents that meet this broad criteria.

[45] Defendants question whether this is the case, as they have obtained information showing that the ATF created an electronic database for its CIs in 2016. (*See* R. 680, Defs.' Sealed Reply in Supp. of Mot. for Post-Hearing Disc. at 8-9.) But that was well after the period for which Defendants' seek information, and the government has convincingly explained that it would still have to comb through paper documents to respond to Defendants' discovery request seeking data for 2006-13. (*See* R. 680-3, Sealed Letter from U.S. Attorneys' Office at 2-3.)

request is very broad and is not limited in temporal scope or to the issue of race. (*Id.* at 14.) As drafted, the request is likely to encompass a vast amount of sensitive law enforcement materials that are not relevant to Defendants' racial profiling defense. Defendants have already received a substantial amount of pertinent law enforcement documents as a result of the Court's prior discovery orders. Under these circumstances, the Court declines to order any additional discovery at this late stage.

The Court also finds no basis to draw any adverse inference against the government, as Defendants request. (*See Flowers*, R. 706, Defs.' Post-Hearing Disc. Mot. at 13.) Defendants have not come forward with any evidence to suggest that the government intentionally destroyed existing documents or evidence for the purpose of concealing adverse information. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (observing that in order to obtain an adverse inference, moving party must show that opposing party "intentionally destroyed" evidence "in bad faith. . . . A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." (citations and internal quotation marks omitted)); *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (denying plaintiff's request for an adverse inference where he "offered no evidence, other than his own speculation," that evidence was "destroyed to hide discriminatory information"). For these reasons, Defendants' post-hearing discovery motion is denied.

In short, this Court carefully and diligently presided over the difficult and time-consuming discovery terrain dictated by the Seventh Circuit in *Davis* that has been subsequently followed by the Third Circuit in its careful *Washington* opinion. This Court did not favor the government or the defense in its delicate treatment of these sensitive law enforcement issues,

which is borne out by the elaborate discovery record and the numerous oral and written rulings issued in these consolidated cases.

## CONCLUSION

These delayed criminal cases must come to a conclusion soon. Defendants' attorneys raised serious, difficult issues that relate to the continuous historic tension our country's criminal law enforcement procedures have had with our country's racially diverse community. The future of these cases is squarely within the discretion of our new U.S. Attorney. This Court can only point out its concerns in this opinion and proceed to set priority trial dates in these long delayed cases. This matter will be set for a status hearing on March 21, 2018, at 10:30 a.m. for the express purpose of setting both cases for jury trials in the near future.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 12, 2018**